## SHARP v. MISSOURI PACIFIC RAILWAY COMPANY, Appellant.

In Banc, March 26, 1901.

Negligence: SECTION HAND: SOUNDING OF WHISTLE: CONTRIBUTORY NEGLIGENCE: WANTONNESS. Plaintiff's husband was a section hand and had been for ten years on the section where he was killed, employing a part of each day as a track-walker. His eyesight and hearing were good. At the time of the accident he was standing outside of the rail, working with his pick in putting in a tie. The first section of the freight train had passed on time a few minutes previously, and conspicuously displayed flags indicating that the second section would follow, the rule being that the sections of the train followed about ten minutes apart. The rule is to sound no whistle for section men unless they seem to be unmindful of the approaching train. The engineer was experienced, and at his post, and the train had begun to slow up as it approached the town. The other section hands saw the train and moved off of the track. Plaintiff's husband did not move, or give any attention to the approaching train. The foreman shouted to him, but he either did not hear or heed the warning. The whistle sounded when distant the length of a few cars. Had he straightened up then he would not have been struck. Another section hand shouted, and if he had then quickly stood up he would have escaped. The engineer could have seen him in ample time to have stopped the train, but it could not have been stopped in time to have avoided striking him after he saw that he was unmindful of the train's approach. *Held*, that the man was clearly guilty of negligence that contributed to his death, and there being no wantonness or recklessness on the part of those in charge of the train, the plaintiff could not recover, and the demurrer to the evidence should have been sustained.

Appeal from Jackson Circuit Court.—*Hon. Chas. L. Dobson, Judge.*

REVERSED.

*Elijah Robinson* for appellant.

The court should have directed a verdict for the defendant. (a) The physical facts established by plaintiff's own evidence show that deceased knew of the approach of the train, and was guilty of negligence in not getting out of danger, and that but for this negligence on his part the accident would not have occurred. Lane v. Railroad, 132 Mo. 26; Kelsay v. Railroad, 129 Mo. 374; Hayden v. Railroad, 124 Mo. 573. (b) The engineer had a right to assume that the deceased would straighten up so as to be out of danger, and was not bound to act on any other theory. Sinclair v. Railroad, 133 Mo. 242; Reardon v. Railroad, 114 Mo. 384; Hyde v. Railroad, 105 Mo. 371; Maloy v. Railroad, 84 Mo. 270; Moody v. Railroad, 68 Mo. 470; Railroad v. Black, 98 Ala. 313; Frazer v. Railroad, 81 Ala. 185; Meredith v. Railroad, 108 N. C. 616; Johnson v. Railroad, 13 A. & E. R. R. Cases, 626 and note; Railroad v. Graham, 95 Ind. 286; Palmer v. Railroad, 112 Ind. 254; Railroad v. Pitzer, 109 Ind. 202; Railroad v. Miller, 25 Mich. 279.

*Teasdale, Ingraham & Cowherd* and *Sam B. Strother* for respondent.

(1) In passing upon the contention that a demurrer to the evidence should have been sustained, this court will accept the testimony in behalf of plaintiff as absolutely true, and will indulge all reasonable inferences in his favor. Kelly v. Railroad, 95 Mo. 281; Gratiot v. Railroad, 116 Mo. 466. And the appellant, not having stood on his demurrer, the question must be determined upon the whole record. Hilz v. Rail-

road, 101 Mo. 36. (2) The appellant owed the deceased the duty to give the usual and timely signals as to the approach of the train. Whether these were given, and whether they were timely, and whether the failure to so give them was the cause of the injury, were questions for the jury. Chamberlain v. Railroad, 133 Mo. 587. (3) The question of the alleged contributory negligence of the deceased was for the jury. (a) The evidence as to the giving of the signals was conflicting. O'Mellia v. Railroad, 115 Mo. 221. (b) Whether he was lulled into a false sense of security by the failure to give the usual signals is a question of fact. Donohue v. Railroad, 91 Mo. 364; Barry v. Railroad, 91 Mo. 70. (c) The train was "slipping along;" was going twenty-two feet per second (15 miles per hour). (d) He was not a trespasser; was where he was in the discharge of his duty, and had some right to rely upon the giving of usual signals. Sullivan v. Railroad, 97 Mo. 119. (e) The other section hands had not left the track on account of the approach of the train, but had done so because their duties called them away. (f) The fair inference is, that they saw the approach of the train because they were facing it, and had nothing to do but look that way. (g) After the signal was given, only about two and one-half seconds elapsed until he was struck. The evidence of Cooper and Keller must be accepted as absolutely true under the demurrer to the evidence. Whether or not one is guilty of contributory negligence, who remains upon a railroad track in the discharge of his duties for the period of two and one-half seconds after he receives a tardy signal of the approach of a train; whether, notwithstanding the tardiness of the signal and defendant's neglect on that score, deceased should nevertheless have rescued himself from the peril to which he was exposed, are questions for the jury; reasonable minds might differ as to what measure of care the deceased used. Bluedorn v. Railroad, 108 Mo.

448; Eichorn v. Railroad, 130 Mo. 587; Kreis v. Railroad, 131 Mo. 544; Gratiot v. Railroad, 116 Mo. 466. (4) The case is clearly within the well understood qualification of the rule of contributory negligence, viz.: Where the evidence tends to show that, notwithstanding the alleged contributory negligence of the deceased, the defendant might, by the use of ordinary care, have saved the life of the deceased by giving the usual and timely signals, the contributory negligence is no defense. Chamberlain v. Railroad, 133 Mo. 587; Reardon v. Railroad, 114 Mo. 403; Schlereth v. Railroad, 115 Mo. 102; Fiedler v. Railroad, 107 Mo. 652; Guenther v. Railroad, 95 Mo. 286; Kelly v. Railroad, 95 Mo. 284; Donohue v. Railroad, 91 Mo. 364; Hanlon v. Railroad, 104 Mo. 388; Loyd v. Railroad, 128 Mo. 607.

BRACE, J.—This is an appeal from a judgment of the Jackson Circuit Court in favor of the plaintiff for the sum of $5,000 damages for the death of her husband, William Sharp, who on the second day of November, 1895, was struck by one of the defendant's trains and killed; and whose death, it is alleged in the petition, was caused by the negligence of defendant's servants, "in this, namely:

"First. The agents, servants and employees of defendant, in charge of said train, negligently, carelessly and unskillfully failed to give reasonable and sufficient notice of the approach of said train by blowing the whistle or ringing the bell, or by otherwise warning the deceased of the approach of the train.

"Second. The agents, servants and employees of defendant in charge of said train, negligently, carelessly and unskillfully failed to stop said train after they knew or might have known by the exercise of ordinary care of the danger in which said deceased was placed.

"Third. The agents, servants and employees of defendant in charge of said train negligently, carelessly and unskillfully failed to stop said train in time to avoid injuring the deceased.

"Fourth. The agents, servants, and employees of said defendant in charge of said train negligently, carelessly and unskillfully failed to keep watch along the track in the direction in which the train was moving toward said deceased."

The answer was a general denial, and a plea of contributory negligence. At the close of plaintiff's evidence defendant demurred thereto, and at the close of all the evidence renewed its demurrer. The refusal of the court to sustain the demurrer at either stage, is assigned as error, and this presents the crucial question in the case. The material evidence in the case is as follows:

### PLAINTIFF'S EVIDENCE.

W. B. Cooper, testified:

"I live at Lee's Summit, and on November 2, 1895, I was in the employ of the Missouri Pacific Railway Company at that place, as a section laborer. William Sharp was also a section laborer, working in the same gang with me. At that time there were five laborers and the foreman in the gang—J. M. Green, foreman; F. A. Radford, Abner Keller, James Himes and myself. On the day Sharp was killed we were working in pairs, putting in ties. In doing that we were two together, but Sharp was working alone. He was the regular track-walker, and would go over the track every day, and he had gone over it that morning. He got back from going over the track between eleven and twelve o'clock that forenoon, and went to work with the rest of us.

"Going through Lee's Summit the track runs east of south

and west of north.   The place where we were working there that morning is southeast of the main part of the town, southeast of the depot.   At the time Sharp was killed we were between half and three-quarters of a mile southeast of the depot. The nearest crossing that we were to was what we called the school crossing; that is, the crossing that crosses from the schoolhouse there by the park, which is a public crossing.   We were between a quarter and a half a mile from that crossing, which was between us and the town.   From where Sharp was killed to the first crossing southeast was fully a mile and a half.   The track from where Sharp was killed, easterly, is level for about three-quarters of a mile, and is absolutely straight.   The track runs alongside of the park and we were about 120 feet south of the park fence.   The baseball grounds lie south of the park and also extend up to the railroad track.   People use the track occasionally in going out to the baseball grounds or the park. I have noticed a good many people walking out that way.....

"I had been working just northwest of Mr. Sharp, and just before he was killed we took our tools and moved down the track southeast of him.   About the time I started to move from where I had been working northwest of him I noticed the train approaching from the southeast.   I suppose it was about a quarter of a mile distant.   I didn't hear it before I saw it. When I saw the train I was walking in the direction that it was coming from, and I saw it coming and kept walking along the track until it got pretty close to me, when I stepped off the track to one side to let it pass me.   I stood there to one side of the track, waiting for the train to pass me, for I saw that it was too close to go to work again. The place where I stepped off was about where I was going to go to work again, and so I had to stand there until it passed, and I kept my eye on the train, noticing it as it was coming up, until it was right close to me, and, when it was right about beside me, I turned my head a

little in the direction in which the train was going, and saw Mr. Sharp standing close to the track on the south side of the south rail. We had taken out an old tie, and he was standing down in the bed where the old tie had been, and was working, cleaning it out, so that a new tie could be put in; but he was standing outside of the rail—standing with his feet outside of the rail on the south side, but stooping over the rail, working on the inside between the rails, working with a pick. I don't remember whether he was in that position when I passed him, but he was in that position when I turned my head and noticed him. Mr. Keller was working with me, and we had just put in a tie northwest of where Sharp was working and had gone to a point southeast of him to put in another. I think the distance from Sharp to the point southeast of him where we went to put in another tie was about fifteen feet. As the train approached, I was standing on the south side of the track, in between the rails of the side-track. I don't exactly recollect where Mr. Keller was standing just at that time. He and I were the nearest people to where Mr. Sharp was working at the time he was killed. I never noticed whether the train was puffing when I first saw it approaching, but it was not puffing as if pulling hard, when it got close to me. The wind was blowing about due south, kind of diagonally across the track. It was not very strong, just a moderate wind. As the train approached I had my face toward it, and I gradually turned around, and, when I got turned far enough, I saw Mr. Sharp still working there, paying no attention, and I saw it was getting pretty close to me, and I said "Look out!' I didn't call his name, but, as it got closer right away, I said, 'Look out, Dad,' for we all called him 'Dad' on the road there, and, about that time, it was right up to him and hit him. From the time I had passed Mr. Sharp, he hadn't changed his position any way. He was standing there in the same way right up to the time the train struck him. I didn't

see any signal or hear any, until they blew the whistle, until the whistle blew for danger. I can't say exactly how far the train was from Mr. Sharp when the whistle blew, but I think it was about two rail lengths, or sixty feet from him. It might have been more. My face was toward the train as it came down the track. I don't know as I was standing square this way toward the track, or whether I was standing square this way; but whatever way I was standing I was situated so I could see the train, and I was watching it as it came up. I could not say exactly how close the train was to me before my attention was directed to Mr. Sharp, but I know it was very close, right up to me almost. It was getting very close, I know that. It was about two rail lengths from me when I first holloed, but Sharp didn't do anything to indicate that he heard me when I holloed the first time. The second time I holloed was just when the train was right on me, and I can't say that he heard me. I just noticed him move, and that was all, and it seemed as if the train struck him almost immediately. The whistle blew before I said, 'Look out, look out, Dad.' I don't remember whether the whistle blew before I holloed the first time. I didn't notice the engineer at the time the accident occurred, but had noticed him when the train was approaching, about two hundred yards distant. He was either standing or sitting at his place in the cab. The engineer could see half or three-quarters of a mile along the track. I can't tell how far the engine knocked Sharp when it struck him, but I suppose ten or twelve feet. I suppose it was two hundred yards north-west from where Sharp was struck to where the caboose came to a standstill. I don't remember how many cars there were in the train, but it was a good long train. Sharp didn't speak after he was struck. When the engine was about sixty feet from Sharp it gave two short, sharp blasts of the whistle close together. I could not say how long it was from the last sound

of the whistle until the engine struck Sharp.   I suppose, possibly, there was time for a man to straighten up, after the last blast of the whistle sounded, and before the train struck him, if he had done it right away.   I didn't hear any bell rung."

On cross-examination, he testified:

"Mr. Sharp and I were working there in the same section gang.   He had been working there on that section for ten years, to my knowledge.   The section on which we were working extends from about one mile east to about four miles west of Lee's Summit.   In working on sections that way, men become very familiar with the numbers of the trains.   The number of the train that struck Sharp was second 129.   What I mean by 'Second 129, is this:   The first train due at Lee's Summit after twelve o'clock is a freight train, and it is numbered 129, and it is due there at that place, that is, Lee's Summit, at 12:54, and it carries flags.   The first number of any regular train that is in sections carries flags for the next section to follow it, and we understand the meaning of the flags. If there is no other section to follow it, it carries no flags.   The red flags indicate there is another train of that same number coming behind, and, when the first one comes and carries flags, that indicates another section of it, and we look for it along at almost any time.   When a train is run in sections, the sections are numbered first, second, and so on, with the the number of the train, that is, First 129, Second 129, and so on.   The train that struck this man was Second 129, and the first section was due there at 12:54.   It passed about on time.   I had no watch and could not say to a minute, but it must have been about on time, for it passed just before we went to work, and we always went to work at one o'clock.   We ate dinner that day right by the side of the track, on the south side, about nine feet from the track, Mr. Sharp with the balance of us.   The flags that are carried to indicate that another train is following are red

flags, and the first section of No. 129 that passed before we went to work was carrying red flags on the engine in a conspicuous place, where they could be easily seen. Now, when a train carries those flags, it is notice that there is another section of the same train following—that it practically runs on the same time as the first section. These different sections run ten minutes apart. Sometimes they may be delayed a little; but those flags indicate that there is another section coming, and we expect it along at almost any time after the first section has passed. After we ate dinner, Sharp and the rest of us went to work again. We ate right close to the place where we went to work. I think that he went to work right at the same spot where he had been working before dinner, but I don't remember about that. We were engaged that day in taking out old ties and putting in new ones. Sharp went to work there where he was struck right away after he ate dinner. Keller and I went to work at a point about thirty feet northwest of where Sharp was at work, and then moved from there to a point on the track a little southeast of where he was at work. In going from one point to the other we walked southeastwardly. I was between the main track and the passing track, and Keller was close to me, but on the opposite side of the track. That is my recollection. When we passed Mr. Sharp he was at the point where he was struck. I don't think we said anything to him as we passed. We didn't say anything to him about the approaching train; didn't think it was necessary. I don't know that I thought anything about it at all. He was standing on the outside of the rail. If it had occurred to me that he was in any danger I would have spoken to him as I passed, but it didn't occur to me that he was in any danger, although I saw the train approaching. Where he was standing, if he had just stood up straight, the train might not have struck him or touched him at all. I don't know how far that beam extends

out on the front of the engine, but it seems to me that if he had stood up straight possibly it would not have struck him, but I can't say positively how that would be.

"Q. Well, now, a man standing there in that position digging, he would be out as far as the ends of the ties—that is, his feet would be out as far as the ends of the ties, wouldn't they? A. Well, of course, if he was standing on the outside he would be standing right at the ends of the ties. His feet would be in between them probably.

"Q. That is, if he was standing on the outside of the rail? A. Yes, sir.

"Q. Well, now, how far do the ties project out over or beyond the rail on the outside? A. Sixteen and a half inches.

"Q. Now, what portion of his person was struck? A. Well, I noticed it strike his head.

"Q. What was it struck him? A. That beam that is there.

"Q. That is, the end of what they call the "pilot beam" struck his head? A. Yes, sir; I suppose so. It is that square timber there.

"Q. Say this is the engine here, there is a large timber there, that is in front of the engine just above the top and at the hind end of the cow-catcher? A. Yes, sir.

"Q. That is about twelve inches square, is it not? A. Yes, sir; about that.

"Q. And it projects out on each side of the front part of the engine, does it not? A. Yes, sir.

"Q. It projects out beyond the boiler? A. Yes, sir.

"Q. And that piece of timber is what you say struck Mr. Sharp? A. Yes, sir.

"Q. It struck him on the head? A. Yes, sir.

"Q. And killed him? A. Yes, sir.

"Q. He was killed instantly? A. Yes, sir; he did not

live any length of time to amount to anything.

"Q.    Now, I want you to tell the jury whether or not you examined him after he was killed?    A.    I looked at his head.

"Q.    You saw where it struck him?    A.    Yes, sir.

"Q.    Now tell the jury where the wound was?    A.    Well, right above his right eye, there was a three-cornered hole made in his head, and another place on the back of his head on the other side.

"Q.    The engine could not have struck him there very well, could it, from the way he was standing?    A.    No, sir.

"Q.    That was probably made by his falling over.    After the engine struck him he probably fell over backwards against something.    A.    I don't know, but that is what I supposed.

"Q.    Now, this three-cornered hole that you speak of, or three-cornered wound, was near the top of the head and above and back of the right eye?    A.    Yes, sir.

"Q.    A little forward and above the right ear?    A.    Yes, sir.

"Q.    Was there any other wound on him?    A.    Well, his jaw was broken also.

"Q.    Now, I understand you to say on your direct examination that, at the time just before the time this accident occurred, you passed Mr. Sharp going south on the track, with your tools, for the purpose of going to work at another place, having got through with your work where you had been working, and you went about fifteen feet past where Mr. Sharp was working when you got out of the way and waited for the train to pass?    A.    Yes, sir.

"Q.    And you told the jury also, I believe, that naturally you were looking in the direction from which the train was coming?    A.    Yes, sir. . . . .

"Q.    Well, the exact position you were standing in, you

Vol 161 mo—15

don't just recollect, but you do remember that you happened to look around towards Mr. Sharp about the time the train whistled, and saw that he was still in that position stooping over the track there working? A. Yes, sir.

"Q. And you halloed to him? A. Yes, sir.

"Q. And that did not attract his attention? A. No, sir.

"Q. And then, as the train came by you, you holloed again? A. Yes, sir.

"Q. And I suppose, immediately after you holloed, so quickly you say, as I understand you, that you did not have time to estimate the time, or do anything, the train whistled and it struck him? A. Yes, sir; it seemed to hit him almost instantaneously after I holloed the last time, just about as the last of the hollo was made, the engine hit him, it was all done very quickly, though.

"Q. Now, I understand you to say that the engineer on that train could have seen him half a mile off? A. Yes, sir.

"Q. Now, is it not a fact that he could have seen the engine the same distance if he had been paying any attention to it? A. Yes, sir; I suppose he could.

"Q. Well don't you know he could, if he had been looking? A. Yes, sir, I think there is no doubt about that.

"Q. Well, he did not pay any attention to you when you first holloed? A. No, sir; not that I saw.

"Q. He did not, as a matter of fact, pay the slightest attention to you? A. He never made any motion or indicated that he did.

"Q. Did he the second time you holloed? A. Well, he turned his head that way( illustrating). I don't know whether he heard me or not, or whether it was the whistle.

"Q. The second time you holloed, he just seemed to turn his head that way? A. Yes, sir; that was just about the

time that the train was very close to him—right on him I might say—he seemed then to turn his head like that.....

"At the time the train struck Sharp it was running at a moderate rate, the ordinary rate for trains to run at that place —as trains usually run when approaching a station. The engine that struck Sharp was one of those large freight engines. The engineer's position is on the right-hand side of the cab, and on that particular train he was on the north side of the engine.

"Q. Now, I will ask you this question: Where Mr. Sharp was standing, and where the engineer was located, whether he was sitting or standing in coming up to that place where Mr. Sharp was, from the east, is there not a certain point, before the engine reached Mr. Sharp, where the front end of the boiler would get between the engineer and Mr. Sharp, and obstruct the view of the engineer? I do not ask you to fix that point, but is there not a point where that would occur? A. Yes, sir, it would come in between them, of course.

"Q. Before the engine reached Mr. Sharp, the boiler would obstruct the view of the engineer? A. Yes, sir; there is no disputing that.

"Q. Now, when the train whistled those two sharp blasts of the whistle, I understood you to say you thought the engine was at least two rail lengths and probably more, distant from Mr. Sharp? A. Yes, sir; something near that; it might be less.

"Q. Now, is it not a fact, that if Mr. Sharp had given attention to those whistles, he would have had abundance of time to straighten up, and even step back, wouldn't he, before the train reached the point where he was? A. Well, he would if he had moved right quick.

"Q. Suppose he was standing in that position, and the train was coming at the rate of speed you say it was—what was

the rate of speed, what did you say? A. Oh, I suppose twelve or fifteen miles an hour.

"Q. Well, then, suppose he was standing there in that position, and the train whistled down there sixty feet away, and, as you say, it was running at a moderate rate of speed, he could have stepped back out of the way of the train in a second, or less than a second of time, couldn't he? A. Yes, sir; of course he could, if he knew what he was doing, if he knew the danger he was in, and had the presence of mind to move quick, he could. . . . .

"Q. Well, as a matter of fact, Mr. Sharp did not give any indication of paying any attention to the train when it whistled for him? A. No, sir.

"Q. And you don't know how to account for his conduct on that occassion? A. No, sir.

"Q. Did you ever hear Mr. Sharp remonstrated with about his habit of standing on the track and letting the trains get within dangerous proximity to him? Did you ever hear him remonstrated with, and warned about the danger of doing that? A. Yes, sir.

"Q. Before that time? A. Certainly, it was before that time.

"Q. Have you heard him warned about that? A. Yes, sir; I have heard him spoken to about that.

"Q. Well, how often have you heard him spoken to in regard to a habit of that kind? A. Well, I can't say positively, but as much as two or three times, I think.

"Q. Who did you hear speak to him about that habit? A. I have heard the foreman speak to him. I have heard Mr. Green speak to him.

"Q. And who else have you heard speak to him about that? A. I have heard his son Ed. speak to him, and I have heard Mr. Radford speak to him. Those are the three that I

have heard speak to him about it.

"Q.   You remember those three?   A.   Yes, sir.

"Q.   Up to the time the train whistled there was nothing to indicate to your mind that Mr. Sharp was not going to get out of the way?   A.   No, sir; I had no thought that he was in the way at that time, until I saw him there.

"Q.   The train was about a quarter of a mile distant when you started down the track?   A.   Yes, sir; about that distance or further.

"Q.   Of course it was getting nearer all the time and the time when you passed Mr. Sharp it was probably still closer? A.   Yes, sir; it was coming all the time.

"Q.   And the position he occupied at that time was not such as to indicate to your mind that he was in any danger? A.   No, sir.

"Q.   And it did not occur to you that he was in any danger until about the time the train whistled?   A.   No, sir; it was about that time that my eye caught him, and then I thought he was in danger, of course, for I holloed to him.

"Mr. Sharp was a low, heavy set, compactly built man, strong and vigorous, but not very well at that time.   He had a spell of rheumatism before that.   His general health was good, but he complained of his rheumatism.   His eyesight was good for a man of his age.   I have noticed him reading newspapers without glasses.   His hearing was good. . . . .

"I don't pretend to say that the whistle was not blown before I heard it give the two sharp toots that I have spoken of, but, if so, I didn't hear it.   Working on the track that way, we become so familiar with the sound of the whistle, that, unless there is something to particularly attract our attention to it, we can't tell afterwards whether the whistle has blown or not. If it was blown, and I heard it, I haven't the slightest recollection about it.   If I happened to pay attention, I could hear the

rumbling of a train a quarter of a mile, but I didn't notice the rumbling of that train until I started up the track and saw it."

J. A. Keller testified:

"I live at Lee's Summit. On the second day of November, 1895, I was in the employ of the Missouri Pacific Railway Company, working on the section. I remember the occasion of William Sharp getting killed. I was working with Mr. Cooper. We were working up east of him when he got struck, but before that had been working just west of him. We were putting in a new tie. After we finished putting in the tie west of him, we went to another place just east of him. At the time Mr. Sharp was struck, I was standing right across the railroad track opposite Mr. Cooper. I was on the north side of the track, and Mr. Cooper on the south side, some fifteen or sixteen feet from Mr. Sharp—I could not tell exactly the distance. When I heard the signal given by the train it was on up ahead of us a piece, eastwardly, and coming west. I guess it was about sixty-five or seventy, or perhaps seventy-five feet away from him when the signal was given. I didn't hear anyone hollo to Mr. Sharp, nor did I look at him when I heard the signal. From the time we passed him, going from the point west, to the point east of him, I don't think I noticed him. The signals that were given by the train were two right short, sharp, keen whistles, they were not so very long.". . . .

On cross-examination, he testified:

"I think the train was kind of slowing up at the time it struck him, but would not be sure about it. I could not tell how fast the train was running at the time it struck him, but don't think it was running as fast as freight trains usually run out on the road between stations. I am positive about that. . . . .I was on the opposite side of the track from Mr. Sharp, and the train came between me and him, and therefore I did not see him struck. The train might have been further than

sixty-five or seventy feet away from him when it whistled. I am satisfied that it was that far. I suppose the train was running, at the time of the accident, ten or twelve miles an hour."

W. B. Cooper, recalled, testified:

"I would presume the speed of the train, at the time of the accident, was about ten or twelve miles an hour. Probably fifteen miles an hour. I will say from ten to fifteen miles an hour. I don't know positively how many cars there were in the train, but I suppose from eighteen to twenty-five—somewhere along there. The track was dry. I suppose the track was not exactly level, but it was nearly level."

## DEFENDANT'S EVIDENCE.

J. M. Green, testified:

"On the second day of November, 1895, the day William Sharp was killed, I was section foreman of that portion of the Missouri Pacific railway, covering the point where the accident occurred. William Sharp and several other section men were working on the track just east of Lee's Summit. I had gone up the track in the direction of Lee's Summit some little distance, to examine some splices. At that point the track is straight for quite a distance, and the train could be easily seen for several hundred yards. I heard the train whistle, and turned and started back in the direction where the men were at work. The train was quite a distance away when it first whistled. William Sharp was standing on the outside of the track working with a pick. As the train approached, the other men got out of the way, but Sharp continued to work, leaning over the rail working with a pick. He was on the south side of the track. He did not seem to notice the approach of the train. I shouted, and motioned to him to get out of the way. I heard one of the section men also halloo to him. He did not

pay any attention to us, nor did he pay any attention to the approaching train. When the engine was four or five rail-lengths from him, the engineer again sounded the whistle, but he paid no attention to it, and the engine struck him and killed him. If he had straightened up the engine would not have struck him. The train was running ten or twelve miles an hour. It had already begun to slow up for Lee's Summit. I have observed railroad trains so much, and for such a long time, that I can form a very fair estimate of the speed of trains. Mr. Sharp had, before that time, been in the habit of remaining on the track when the train was approaching until it would get in dangerous proximity to him, and he had before been warned in regard to it."

Charles Boyle testified:

"I live at Sedalia, Mo. I am a locomotive engineer, and in the employ of the Missouri Pacific Railway Company. I was running the engine which struck and killed William Sharp on November 2, 1895. When approaching Lee's Summit, I sounded the whistle for the crossing, which is about a quarter of a mile east of where Sharp was struck. When I got within about six hundred feet of where he and the other section men were at work, I sounded the whistle to warn them of the approach of the train. They all seemed to get off the track. When about one hundred or one hundred and fifty feet from where he was struck, I saw that he was standing close to the track, and leaning over it with a shovel or pick, or something of that kind in his hand, and I blew the whistle again. I supposed the man had got out of the way, but the fireman told me the engine struck him. If he had only straightened up he would not have been struck. I had begun to slow up for Lee's Summit, and was not running faster than ten or twelve miles an hour at time of the accident. My place is on right-hand side of the engine and he was on the left side of the track."

John Houper testified:

"I live at Sedalia. Am a locomotive fireman, in the employ of Missouri Pacific Railway Company. I was firing on the engine which struck and killed William Sharp near Lee's Summit last November. Just before the accident, I had been putting coal in the engine. I heard the whistle sounded, and put down my shovel, and closed the door to the furnace, and stepped in the cab to ring the bell, and, just as I got to the front of the cab, so I could see out, the engine struck the man. It barely did strike him. He was on the outside of the rails, but a little too close to the track. I did not see him until the instant he was struck. The engineer had blown the whistle for the crossing, which is about a quarter of a mile east of where the accident occurred, but that is not the time I referred to when I was firing up. When he blew that whistle we had already passed that crossing, and must have been in a hundred or two feet of where the man was struck."

The plaintiff also introduced some evidence tending to prove that the train could have been stopped within a space of one hundred and fifty feet, and the defendant's evidence tending to prove that it would have required a space of from eighteen to thirty car-lengths, in which to stop the train at the speed at which it was going, and that the view of the track in front of the engineer is obstructed by the smoke stack for about fifty feet. And on cross-examination of one of defendant's witnesses (Schieben) plaintiff drew out the following evidence:

"To warn persons on the track we give several toots of the whistle, depending on circumstances. We don't ordinarily wait until we get up within a foot or two of a point where some part of the engine will obstruct our view, before giving the signal. I would give the signal to warn a person on the track twenty car-lengths away. The distance would depend a good deal on circumstances—upon who it is. If it was a section

hand, I would not give any toots at all, because they will stay on the track and work until the last minute before they will get off the track. The fact as to whether I would give the danger signal would depend upon whether the party was a section hand, unless it appeared that he didn't hear or see us. As a rule we don't give a section man any warning at all. Of course if we should get very close to him, and he didn't show any signs of getting out of the way, I would warn him the same as anybody else. By 'close' I mean ten or twelve car-lengths. I would then give a signal by continual toots of the whistle. I would say that the whistle could be tooted as often as thirty times in running a distance of 350 or 400 feet."

And on re-direct examination that witness testified as follows:

"Section men are in the habit of working right along until the engine gets very close to them. If a man was standing on the side of the track I would not give the signal as readily as if he were standing on the track, unless he was so close that the train might strike him in passing. A man may be on the track studying, and not thinking about the train, and we make an alarm with the whistle to put him in mind of where he is and his danger. That is the only purpose of sounding the whistle, and if a man is standing on the outside of the track, we don't give the danger signal as quick as if he is on the track. If a man, on the outside of the rail, had his back to us, we would give the signal as quick as if he were on the inside; that is, if he were all alone, but if there were others working there with him I might not."

It requires no close analysis of the evidence in this case to discover that whilst there are slight differences in the opinions, and in the estimates of time and distance between some of the witnesses there is really no substantial conflict in the evidence. All the witnesses seem to have testified fully, freely and

fairly touching the matter according to the best of their knowledge and memory. And making all reasonable inferences in favor of the plaintiff from the undisputed facts thereby established, it is not possible for reasonable minds to differ as to the fact that the negligence of the deceased in being within the danger line of section No. 2 of the defendant's train at the time he was struck, contributed directly to the injury which resulted in his death.

He was a man of mature years, in possession of all his faculties, with good eyes, and ears, and with an experience of many years as a section hand on this railroad, was familiar with the movements of its trains and their signals. He was distinctly advised by the passage of section No. 1 with its flags flying, that section No. 2 was coming, and to be on the lookout for it. It did come on time in accordance with the warning given, and coming was plainly visible for a quarter of a mile from the place where the deceased was standing. Nevertheless he continued at his work with a portion of his body within the danger line, facing the track, without paying any attention whatever to the coming train, when by simply turning his head, or even casting his eyes in that direction, he could have seen the train in ample time to have moved out of its way, with the greatest leisure if he had chosen to do so. The only inference that can be drawn from his conduct is that he either did not look or listen for the train and for that reason was unconscious of its approach, or, being conscious of its approach, he willfully remained on the danger line and thus committed suicide. Indulging the more charitable inference in his favor, he was at least guilty of such inexcusable negligence contributing directly to his death as to preclude a recovery in this action; *unless* the conduct of the servants of the defendant managing the train, was characterized by such willfully, wanton or reckless disregard of human life, also con-

tributing to his death, as that the defendant ought not to be heard to say that the plaintiff was guilty of such negligence. [Tanner v. Mo. Pac. Ry. Co., 161 Mo. 497; Morgan v. Wabash Ry. Co., 60 S. W. 195; Kellny v. Mo. Pac. Ry. Co., 101 Mo. 67.]

The facts and circumstances which bring a cause within this exception to the general rule that contributory negligence of the plaintiff or deceased, precludes a recovery, are as variant as the cases in which it has been invoked, and but little assistance can be derived from adjudicated cases, in which the facts are seldom analogous to the one in hand. To arrive at a correct conclusion in a given case, the only rational mode is to put ourselves in the place of the one charged with such conduct and interpret his conduct in the light of all the facts and circumstances by which he was surrounded, and in view of which he acted.

In this case our inquiry is confined to the conduct of the engineer who had the control and management of section No. 2, and to his conduct, not towards persons on crossings or quasi-crossings, or trespassers on the track, but towards a co-employee in the service of the same master, and as familiar with the movements of the master's trains and their signals, on this section of the road, of which he was the track-walker, as was the engineer himself. That he was a competent and skillful engineer is not questioned. That in approaching the place of the accident he was running his train at the usual and ordinary rate of speed, was at his post, on the lookout, and promptly saw the deceased, is undisputed. When he first saw him, however, he saw him in connection with his associates, and as a part of the gang of trackmen some of whom were on and some beside the track, and discovered that those on the track, as the train was approaching them, were, as was their habit, moving out of danger; and knowing that they had been warned to be

Sharp v. Missouri Pacific R'y Co.

on the lookout for his approach by the preceding section, he had every reason to believe that all would do so.   Upon a nearer approach, however, he discovered from the position of the deceased beside the track, that the whole of his body was not outside the danger line, and he gave the usual danger signals, at a distance sufficient to have enabled the deceased easily to have withdrawn himself from his exposed position, before the train reached him, as the engineer supposed he had done until he was afterwards informed that the deceased had been struck.   Of course it is impossible to say exactly at what distance the engineer discovered the exact situation of the deceased in regard to the danger line or at exactly what distance from him the engineer gave the danger signal.   But conceding that the situation of the deceased could have been discovered at such distance as to have suggested the propriety of giving the danger signal sooner than it was given, and that it might have been sounded oftener than it was, there was nothing in the situation that seemed to imperatively demand that it should have been sounded sooner or oftener, and certainly nothing· in the whole conduct of the engineer on the occasion that could be characterized as a willful, wanton or reckless disregard of human life, such as is necessary to take the case out of the general rule, that contributory negligence precludes a recovery. The court erred in overruling the demurrer to the evidence, and for this error the judgment will be reversed.   All concur.