RICHARD COGAN, Respondent, v. CASS AVENUE
AND FAIR GROUNDS RAILWAY COMPANY,
Appellant.

St. Louis Court of Appeals, December 23, 1902.

1. **Railroad, Street:** CONTRIBUTORY NEGLIGENCE: NO RE-
COVERY. A man about fifty-six years old was, on a clear bright
day, driving a two-horse wagon south on Fourteenth street and
the car which hit his wagon was running east. He first saw the
car as he was coming onto the track, but thought he would have
time to pass over and was hit before he got off the track. *Held,*
that he did not use ordinary care to look and see the car that hit
his wagon as he drove along Fourteenth street, and he was there-
fore precluded from recovering.

2. ———: ———: DEFENDANT'S NEGLIGENCE, PROXIMATE
CAUSE: LIABILITY. Where the defendant company may, by the
exercise of ordinary care, discover plaintiff's peril, it is defendant's
duty to do so, and if it negligently fails to do so, it will be liable,
provided such failure was the proximate cause of plaintiff's injury.

3. ———: ———: DEMURRER TO EVIDENCE, WHEN PROPER.
On a demurrer to the evidence by defendant, plaintiff is entitled
to the full weight of all the facts and inferences flowing therefrom,
but if there is no testimony to support his case on some essential
feature thereof, then the binding instruction to find for defendant
should be given.

Appeal from St. Louis City Circuit Court.—*Hon. S. P.
Spencer,* Judge.

REVERSED.

*Boyle, Priest & Lehmann, Geo. W. Easley, Lon. O.
Hocker* and *Walter H. Saunders* for appellant.

On the disputed points, the testimony is overwhelm-
ingly in favor of the defendant. One witness for plain-
tiff himself says that no bell was rung. Six witnesses
of the defendant say that the bell was repeatedly rung
while the car was approaching Fourteenth street. This

point was immaterial, however, because plaintiff states that he twice saw the car before he reached the track. In any view of the case, the positive testimony of six witnesses is worth more than the negative testimony of one, the most interested witness in the case. Sanders v. Railroad, 147 Mo. 411; Jackson v. Railroad, 157 Mo. 621.

*A. R. Taylor* for respondent.

(1) How can a court without any more knowledge of the operation of street cars than a layman, without any more knowledge than a layman as to how to cross a railroad track, undertake to substitute its judgment for that of a jury upon these questions? The law by entrusting this duty to a jury has clearly denied it to the court. Is it upon the theory that a court is more intelligent or more fair than a jury? Convince the source of power of this fact and they will probably amend their constitution and change the law, but until so convinced, the rule prescribed by the sovereign will ought to be observed. (2) Let the court determine the law and advise the jury what it is, and let the jury determine the facts, and apply the law. This is the genius of our judicial system. This is the flower of the law in full blossom. No court has the right to disregard it on the ground that a jury mistakes the facts. There is one corrective restraint, alone, provided by the law—the power of a trial court to award one new trial on the ground that a verdict is against the weight of the evidence. And a conclusive answer to this contention is that the power that made the law and makes officials to administer it, has thought fit, through the history of this country and its mother, in the law, to prefer to entrust this function to a tribunal other than the judge. (3) The practice of courts usurping the functions of the jury has produced a great part of the confusion of decisions which all must admit to exist. This it is that

terrorizes trial courts and makes their duty of properly determining what the law is so uncertain and arduous.

BARCLAY, J.—Plaintiff had a verdict and judg-ment in the circuit court in this action for injuries sus-tained by him in a collision in June, 1899, with a street railway car operated by the defendant company. He began his action before Justice Cullinane, and on ap-peal the case was tried anew with the result of a finding and judgment for plaintiff in the sum of $550. De-fendant then prosecuted this appeal after taking the necessary steps for that purpose.

Plaintiff's case, as stated by him as a witness, dis-closes that he was a man of about fifty-six years at the time of the mishap in suit. He was engaged in hauling for one of the electric power companies, and was on his way from home to work, driving a two-horse team in a wagon, almost empty, at about 6:20 a. m., June 21, 1899. The collision took place at Four-teenth and Carr streets in St. Louis. Plaintiff was driv-ing south on Fourteenth street and the car which hit his wagon was moving east on Carr street. The day was bright and clear.

Plaintiff's own story of the affair, or the material feature of it, had better be given in his own language as it appears in certain passages of his testimony as follows:

"Q. Now, you were driving south on Fourteenth street with your team? A. Yes, sir.

"Q. Was your wagon empty or did it have any load? A. It had nothing only me and the feed-box—that is all. Of course, you don't want to work all day without eating something, do you?

"Q. Well, now, as you approached and were cross-ing Carr street, how were you moving—in a walk or trot? A. I was going in what you call a little dog-trot; just trotting along something like a good spring-

walk.  Horses that are used to going that way go easier than in a spring-walk.

"Q.  Now, in what part of Fourteenth street were you driving?  A.  I was in the middle of the track, going south.

"Q.  Was your wagon in the track?  A.  Yes, sir; on the Fourteenth street track, going south.

"Q.  There was a railroad track on Fourteenth street, was there?  A.  Yes, sir; of course there was.

"Q.  Now, on Carr street was the defendant's track —the Cass Avenue and Fair Grounds Railway Company?  A.  Yes, sir.

"Q.  Did they have one track or two tracks on Carr street ?  A.  Now, I don't exactly know, but I know there is one.  I don't know whether it has a double track on that street or not.

"Q.  Well, when you were coming into Carr street, did you look west to see if there was a car coming?  A. I did.

"Q.  Did you see a car?  A.  I did; I seen a car about 200 or 250 feet from me coming down; the car was going east.

"Q.  Well, it was coming towards you?  A.  Yes, sir.

"Q.  Looking up the street and seeing the car coming could you tell anything about its speed?  A.  Well, sir; I could not tell exactly how fast they were going until they struck me, and I know they knocked me down pretty quick.

"Q.  Where were you when you realized that the car was about to catch you on the track—had your horses crossed the track, or on the track, or how?  A. They were going towards the crossing on the track, and I was sitting in the middle of the wagon on a seat, and I thought I had time to pass, and before I got off the track I was struck.

"Q.  Well, I asked you if at that time your horses were on the track?  A.  When I saw the car?

"Q. No, when you first saw the car, as I understood you, you were just coming on Carr street? A. No, I was coming onto the track.

"Q. About how wide is Carr street—do you remember or do you not? A. Well, I should think it is about—it is a public thoroughfare; it is over forty feet. I think that is about it.

"Q. Now, I ask you the question, where were you when you saw the car was coming dangerously close to you—were your horses across the track, or on the track? A. They were just crossing on the track when the car struck me.

"Q. Were the horses on the track or your wagon? A. My wagon was on the track and the hind part of the horses were just getting off the track when I was knocked down.

"Q. How long was your wagon—about how many feet in length? You had a tongue to your wagon, did you? A. Yes, sir; I could not drive it without a tongue.

"Q. Well, you had a tongue to it? A. Yes, sir.

"Q. Now, can you tell the jury about how long from tongue to rear the wagon was—the wagon and team—about how many feet—twenty-five or thirty or what? A. I should say about twenty-five feet.

"Q. The whole length of wagon and team? A. I think about twenty-five feet; probably a little more.

"Q. Were these large or small horses? A. They were a large team. One was sixteen and one-half hands high and one eighteen.

"Q. The length of the horses would be about what —that is hitched to the wagon. The length would be about what? A. I should think they would come very near ten feet. The coupling pole, I should think, was twelve or fourteen feet.

"Q. The tongue you mean? A. Yes, sir; some twelve or fourteen feet long; it is longer than the horses,

maybe two feet, because they must have something to bear back on.

"Q. Now, what part of your wagon or team did the car strike? A. It struck me about the center. It dashed in from the hind wheel and struck the forward hound, and I did not know anything more after that.

"Q. Do you know how you fell or where you fell? A. I know very well I thought my neck was broke against the car, and I dropped down between the car and the wagon, and I could not tell any more. I thought my neck was broke."

The foregoing quotation is from plaintiff's direct examination. On cross-examination he made the following further statements:

"Q. Now, Mr. Cogan, you were driving these two horses south on Fourteenth street? A. Yes, sir.

"Q. You were going to work? A. Yes, sir.

"Q. Going down to the corner of Nineteenth and Locust streets to work that day? A. Yes, sir.

"Q. At what rate of speed were you driving south on Fourteenth street? A. It was my nearest route.

"Q. I say at what rate of speed were you driving—how fast? A. Well, something in a small trot; what you call a little jog-trot.

"Q. Just a little faster than a walk? A good walk? A. Yes, sir. You see, lots of horses walk as fast as that kind of a trot.

"Q. Well, you were going four or five miles an hour? A. Yes, sir; four or five miles an hour. I wanted to get there first in the morning.

"Q. You were in a hurry to get to work? A. Undoubtedly. The first man there has the first load.

"Q. Now, Fourteenth street is a narrow street, is it not? A. Oh, I don't think so.

"Q. Well, what is the width of it—about? A. It is a pretty wide street, I think.

"Q. Well, what is the width? A. I think about forty feet.

"Q. And what is the width of Carr street? A. I think about the same; I think there is a ten-foot sidewalk.

"Q. There is a single car track on Fourteenth street and a single track on Carr street, is there not? A. I don't know; I think there is on Fourteenth street.

"Q. You say you were driving south in the track? A. Yes, sir.

"Q. Isn't there a church at the northwest corner of Carr and Fourteenth streets? A. Yes, sir.

"Q. That church is built right up to the building line? A. Something like it.

"Q. Well, as a matter of fact, the corner of the church comes flush up to the building line. A. What do you call the building line?

"Q. I thought everybody in town knew what the building line was. For instance, this is the car (illustrating) and this the church (illustrating). There is no vacant space there except the sidewalk? A. That is all.

"Q. Then, there is a row of tree boxes along the north side of Carr street? A. I think there is.

. . .

"Q. (By Mr. Saunders): That was an open wagon? A. It was not a covered wagon, I am sure, to haul dirt with.

"The Court (to witness): Just answer the question. He has the right to ask you any question he desires.

"Q. (By Mr. Saunders): That was an open wagon? A. Yes, sir.

"Q. It had a seat in front? A. No, sir; I had a board right across the center of the wagon.

"Q. There was a board across the center of the wagon and you were sitting on that board? A. Undoubtedly.

"Q. Now when you drove into Carr street, you say you looked up? A. I did.

"Q. Where were you at the time you looked up? A. I was in the wagon.

"Q. I understand that, but whereabouts on Carr street were you? A. I was just getting about to the building line, as you call it, when I saw the car coming, and the car—I thought I could pass it; I thought it was about 200 or 250 feet away.

"Q. You had cleared the building line before you looked up—is that right? A. Yes, sir; I could not look up and the church be there; I could not look through the church, could I?

"Q. Now, how far were you from the track at the time you looked up? A. Well, I could not be very far from the track. . . .

"Q. I say you were fifteen or twenty or twenty-five feet away from the rail when you looked up? A. I suppose so.

"Q. And the car at that time was 250 feet west of you coming east? A. Something like that.

"Q. The car was coming down grade, was it not? A. Of course. You know it is down grade there.

"Q. Now, it is about one hundred yards, is it not, between Fourteenth and Fifteenth streets? A. Well, I don't know, now.

"Q. Well, it is an average city block there? A. Yes, sir.

"Q. When you saw this car then, it was still a little east of Fifteenth street—is that right? When you saw the car you said it was about 250 feet away? A. Yes, sir.

"Q. And it was just a little east of Fifteenth street —is that right? A. Well, I suppose so.

"Q. Now, then, did you continue to look at the car or drive on cross the track without looking? A. I drive on across without looking anymore.

"Q. You did not look anymore? A. No, I was driving and the car came and struck me.

"Q. Did you increase the speed of your horses?

A. I had them going the said gait, but I believe I turned the whip on them when I saw the car getting so close.

"Q. You threw the whip on them when you saw the car was so close? A. Yes, sir.

"Q. Then you increased the speed? A. Well, I did; yes, sir.

"Q. But as a matter of fact you whipped up your horses when you saw the car coming closer? A. Yes, sir.

"Q. How far was the car away from you when you whipped up your horses? A. I could not exactly say.

"Q. Well, about? A. I don't know.

"Q. Well, you can give me some idea, can't you? The car was 250 feet away when you first saw it? A. The car was maybe fifty or sixty feet.

"Q. And where were your horses at that time? A. Crossing the track.

"Q. And you were going between four and five miles an hour before you got there, and you increased the speed as you got on the track? A. I did the best I could to get off.

"Q. What part of your wagon was struck? A. About the center of the wagon. The hind wheel was struck first and then the hound right in the middle of the wagon.

"Q. Were you driving straight across the track or had you turned? A. I was driving straight across on the Fourteenth street track. I was on that track, and I was in that track when I was struck. . . .

"Q. Did you notice the motorman at all at these various times you looked up when the car was coming? A. I seen the motorman on the car, and he never put on any brake until he had me knocked down pretty near. Until he was as near to me as I am to that south wall of this courtroom.

"Q. You said just now that you looked up when

you started across the track and saw the car 250 feet away. Was that the first time you looked up? A. Yes, sir.

"Q. And the second time you looked up the car was fifty or sixty feet away? A. Yes, sir.

"Q. And you whipped up your horses? A. And the motorman started to put on the brake then, and he never rang any bell or drew a brake until he struck me.

"Q. Now, you say that you looked up the first time and the car was 250 feet away, and the second time when it was fifty or sixty feet away, and at that time you urged your horses on. Is that right? A. Well, yes, sir.

"Q. Did you ever look up again toward the motorman? A. I don't believe I did until I was knocked down.

"Q. When you looked up the second time, the motorman was putting on the brake? A. He was, but he was as near to me as that clock.

"Q. You say it was fifty or sixty feet away? A. Yes, sir.

"Q. The motorman was then putting on the brake? A. Yes, sir; he was putting on the brake. He did not ring the bell.

"Q. But he was putting on the brake? A. Yes, sir.

"Q. That was the second time you looked up? A. I believe so."

1. In the foregoing quotations are found the material statements of plaintiff bearing directly on the chief contention of defendant which is that the testimony does not warrant the submission of the case to the jury. That contention was made in the trial court by a peremptory instruction to the jury to find for defendant, which the court declined to give.

There is some contradiction in the plaintiff's own testimony touching the time when he first saw the approaching car which hit his wagon, and touching the

distance between the car and him at that time.   But the strongest admissions which he makes against himself are those by which he must be concluded in determining the effect of his testimony.   From the general rule that plaintiff's admissions in evidence are binding upon him (for the purposes of the trial when they are made) it is a necessary deduction that the strongest admission he so makes must be accepted as the extent of his concession, unless (before he closes his evidence) he shows there was some mistake or misapprehension in what he stated.   The general rule itself is well established in this State.   Shirts v. Overjohn, 60 Mo. 308; Bogie v. Nolan, 96 Mo. 91; Feary v. Railway, 162 Mo. 75.

Here the plaintiff admitted that he was driving south in the rails of the street car track on Fourteenth street, and that "he was coming on to the track" when he first saw the car.   He stated further that he "thought he had time to pass," that when he realized that the car was about to catch him on the track the horses "were going toward the crossing on the track" and that before he got off the track he was struck.   It is clear beyond the possibility of a reasonable inference to the contrary that he saw the car approaching, that he was very near it then and that he drove ahead in front of it, expecting to pass in safety but missing it, unfortunately.   It was his duty to use ordinary care to look out to see the car on the cross-street he was entering as he drove along Fourteenth street.   According to his admissions aforesaid he did not do so until too late, and then he thought he had time to pass in front of the car and drove on. We think that the plaintiff's testimony shows a state of facts which precludes recovery because of his own want of that ordinary care in the circumstances which the Supreme Court and the appellate courts of this State have defined in discussing other cases of alleged negligence.   Lane v. Railroad, 132 Mo. 4; Watson v. Railway, 133 Mo. 246; Huggart v. Railroad, 134 Mo. 673; Peterson v. Railway, 156 Mo. 552; Lien v. Railroad, 79

Mo. App. (K. C.) 475; Conrad Grocer Co. v. Railway, 89 Mo. App. (St. L.) 534.

It is certain that if he did not look out at all for the car on the cross-street until too late to avoid getting in front of it before it reached him, in the circumstances shown in this case, no inference that he used ordinary care in the premises could be reasonably drawn, in view of the decisions aforesaid.

2.    There is no testimony before the court which would bring plaintiff's case within the saving reach of the precedents which hold that where defendant by ordinary care may discover and avert the peril of plaintiff (wherein he may have negligently placed himself) it is defendant's duty to exercise such care to avoid the injury.    That rule of law we fully recognize as established by ample authority binding on this court.    Werner v. Railway, 81 Mo. 368; Weller v. Railroad, 164 Mo. 180; Bunyan v. Railway, 127 Mo. 12.    But that rule does not come into play where there is no testimony tending to show the facts essential to its application.

3.    In determining whether or not plaintiff has a case to submit to the triers of the joined issues, he is entitled to the benefit of every fact in evidence favorable to his contention and of every reasonable inference therefrom.    Norton v. Ittner, 56 Mo. 351; Barth v. Railway, 143 Mo. 535; Lamb v. Railroad, 147 Mo. 171. But if, after giving to plaintiff the full weight of such facts and inferences, there yet is no testimony to support his contention on some material and essential features of his case, it is proper for the court to give a binding instruction for a finding for defendant.    And it is, moreover, error to refuse an instruction to that effect when requested in such circumstances as here appear. Barton v. Railroad, 52 Mo. 253; Sharp v. Railway, 161 Mo. 214; Tanner v. Railroad, 161 Mo. 497.

The judgment is reversed.    Carroll v. Transit Co., 107 Mo. 664.    *Bland, P. J.,* and *Goode, J.,* concur.