GEORGE ELLIS, RESPONDENT, v. WOLFE-SHOEMAKER MOTOR CO., APPELLANT.—55 S. W. (2d) 309.

Kansas City Court of Appeals.   November 21, 1932.

*G. Derk Green* and *Lon R. Owen* for respondent.

*C. M. Kendrick* for appellant; *A. L. Burns* of counsel.

ARNOLD, J.—This is an action in damages for personal injury. Plaintiff recovered judgment in the sum of $3000 and defendant has appealed.

The facts of record are that plaintiff was injured about eight A. M. on July 11, 1930, by being struck by an automobile belonging to the defendant and operated by its employee, one Jesse Crockett

The collision occurred at the foot of the bridge or viaduct on Garcia street and on the east side thereof, in the City of Marceline. The viaduct extends east and west and spans the tracks of the Santa Fe Railroad Company in that city. The automobile in question came over the top of the viaduct from the west and down a grade of 11.66 per cent. The viaduct is flat on top. There is some conflict in the testimony as to how far one can see eastward when driving a car in that direction toward the east and on the flat portion of the viaduct. However, there is evidence that there is a clear view down the east side of the viaduct from the point where defendant's automobile started to go down toward the east, which is about 150 to 160 feet from the point where plaintiff was struck. Starting at the top of the viaduct and going toward the east the viaduct extends down a hill a distance of thirty-nine and one-half feet and is paved with wooden blocks. Beginning with this point, Garcia street is surfaced with cinders to the point at the bottom of the hill where it connects with a gravel surface of the street leading away.

The roadway on the flat part of the viaduct is eighteen feet six inches in width. Beginning at the east incline, it is twenty feet in width to its east end. The street is eighty-one feet wide from side-walk to sidewalk over the portion surfaced with cinders. There are paved sidewalks on each side of Garcia street, leading up toward the viaduct proper. These sidewalks begin eighty-eight feet from the east end of the viaduct or 127½ feet from the top of the incline. From the east end of the south sidewalk there is a cinder path that leads up to the viaduct. When the walk leaves the cinders it goes on over the viaduct and this portion of the walk is fenced off from the roadway. If one should continue directly west from the edge of the paved sidewalk on the south side of the street he would not go over the viaduct but to the south thereof. Persons going westerly over the viaduct upon the south side of the street usually left the paved sidewalk about thirty feet from the westerly end and would then go somewhat to the north and west, as the street narrows as it goes upon the viaduct. However, in going upon the viaduct, after leaving the sidewalk, persons would use the cinder path for the purpose of reaching the viaduct. Many persons proceeded westerly on the south side of the street, then crossed the street at the foot of the incline to reach a path leading north from the north side of the street. There is another crossing of the railroad tracks, which is a grade crossing, north of Garcia street.

sidewalk of Garcia street, proceeded to the foot of the incline and then

Plaintiff, at the time in question, came westwardly upon the south stepped into the street, intending to cross the same for some purpose not disclosed in the testimony. Plaintiff testified he looked west before he left the sidewalk and saw the automobile which afterward

struck him; that it was then about fifteen feet away; that it was that distance away from him when he stepped off the sidewalk; that when he got about two feet into the street he stopped and the driver of the automobile "pulled into me and hit me." There was other testimony that the automoble turned (whirled) just before it struck plaintiff. Plaintiff further testified that "he did not know how far it was from where he was struck to the 'traveled portion' of the street" and that "there were no obstructions in the street." Plaintiff was the only eyewitness to the collision who testified in his behalf.

Defendant's witness, Conrad, testified he was going west on the south side of Garcia street when he saw plaintiff start across the street; that at this time he noticed the automobile coming over the viaduct; that it appeared to be coming down the center of the street; that plaintiff took about a step off the sidewalk; that on account of some intervening trees, plaintiff and the car were out of his sight for a time; that "just as George (plaintiff) came in sight (again) and the car came down the street meeting another car; and it looked to me like he (the driver of the car) had started to pull to his left around him, and I don't know whether he applied the brakes and one didn't take, his right-hand brake take, or not, he turned very near crosswise, and he hit George and knocked George down;" that when he first observed plaintiff the latter was looking at the ground; that "the car was very nearly down the incline and when George stepped out past the trees he was still looking at the ground when I saw him, and it looked like the car was going to pull around him, and instead of that he pulled crosswise in the street."

On cross-examination the witness testified:

"It looked like the car came down the traveled center and when it got down to a point near where Mr. Ellis was, somewhere, the car whirled this way and hit him;" that "there was nothing down the hill to obstruct the car on the incline" and that "if the car had gone down the hill on the traveled portion there was no obstruction."

Defendant's witness, Lomar, testified that he was driving his car west across the viaduct on the north side of the street and on approaching the viaduct, he saw plaintiff starting across the street; that plaintiff was looking down and witness sounded his horn and plaintiff then waved to him; that when the witness got "about half way up to the bridge" he saw the car that afterwards struck plaintiff coming down and observed plaintiff "out in the track where this car would go." . . . About where an ordinary person would drive driving over the hill; and I feared something might happen and I was looking back and the other car struck him, the rear fender of the car, . . . he was a head of me when I waved to him, but the other car was coming down the hill and I knew if the fellow

turned toward me he would hit me, so I was looking sidewise where the car was passing.''

''Q. You knew that in order to avoid hitting Mr. Ellis, he would run into you? A. Yes, sir.''

He was then asked: ''What did the situation look like with reference to that?'' He answered:

''This other car came over the hill and was coming down the bridge, incline, and Mr. Ellis was walking down the street. Of course I was on the other side of the street when I passed Mr. Ellis, he was far enough out in the road a car coming would have struck him if he hadn't got back.

''Q. When you passed Ellis, how far would you say it was from Ellis to this oncoming car from the west? A. I judge forty or fifty feet.''

On cross-examination the witness testified that when plaintiff waved to him Ellis ''was right about on the gravel;'' that there was nothing to prevent the driver of the oncoming car, after he came over the top of the bridge, seeing plaintiff; that the collision occurred ''Just to the back of me, probably fifteen feet;'' that the witness was traveling at a rate of speed of about twenty miles per hour; that the car that struck plaintiff was proceeding at the rate of about twenty-five miles per hour; that it was going at the same rate of speed when it struck plaintiff as before and apparently the driver thereof did not slacken its speed any until it struck plaintiff; that there were marks where the wheels of the automobile of defendant slid, which marks were about thirty feet in length; that the place where the collision occurred ''was almost level.'' It was stated at the trial that Crockett, the driver of defendant's car, was dead.

The case was submitted to the jury by plaintiff upon three grounds of negligence, all of which were charged in the petition. (1) The humanitarian theory; (2) violation of an ordinance of the city prohibiting a rate of speed of a motor vehicle upon the streets of the city in excess of fifteen miles per hour, and (3) common-law excessive speed.

Defendant contends the petition does not state a cause of action under the humanitarian theory, but it is quite apparent without setting forth the allegations of the petition in this respect, that this contention is without merit. The main case on which defendant relies, Holwerson v. Ry. Co., 157 Mo. 216, 57 S. W. 770, was overruled in the case of Murphy v. Railroad, 228 Mo. 56, 80, 128 S. W. 481. The leading case upon the humanitarian doctrine, as now existing in this State, is Banks v. Morris & Co., 302 Mo. 254, 257 S. W. 482. The allegations of the petition in reference to the humanitarian theory meet every essential laid down in that case.

It is insisted the court erred in refusing defendant's instruction

in the nature of a demurrer to the evidence. If the jury was bound to believe the testimony of plaintiff, then, no doubt this contention must be sustained. According to plaintiff's own testimony he stepped into the street when the automobile which afterwards struck him was but fifteen feet away. all of which he saw. While there is testimony that an automobile at the place in question, proceeding at a speed of twenty-five miles per hour could have been stopped within twenty or thirty feet, there is no testimony to show that an automobile traveling at that rate could have been stopped in fifteen feet, under the circumstances. There was no duty upon the driver to do anything with reference to the matter until plaintiff started to leave the sidewalk, at which time, as before stated. the automobile was but fifteen feet away. Therefore, under plaintiff's own testimony, there was no case made to go to the jury except on the theory that the car was suddenly turned and run into him after he stepped off the sidewalk. However, such a theory of negligence is not pleaded and as plaintiff, unquestionably, is bound by his own testimony, the demurrer to the evidence should have been sustained. [Murray v. Transit Co., 176 Mo. 183. 189. 190; Behen v. Transit Co., 186 Mo. 430. 440. 441, 85 S. W. 346; Graefe v. Transit Co., 224 Mo. 232, 264, 265, 123 S. W. 835; Shirts v. Overjohn. 60 Mo. 305, 308; Feary v. Street Ry. Co., 162 Mo. 75. 105. 106, 62 S. W. 452; Cogan v. Cass Ave. Ry. Co.. 101 Mo. App. 179. 188, 189, 73 S. W. 738; Holmes v. Leadbetter, 95 Mo. App. 419, 69 S. W. 23; Steele v. Railroad, 265 Mo. 97, 175 S. W. 177.] The turning of the car into plaintiff was antecedent negligence and not humanitarian negligence.

Even though plaintiff were not bound by his own testimony, there was error requiring the reversing and remanding of the case. There is no question but that there was sufficient testimony to go to the jury upon the humanitarian theory, based upon defendant's testimony, alone. That testimony tends to show that plaintiff was in the street in the act of crossing the same when the automobile, that afterwards struck him, came over the top of the viaduct; that plaintiff was looking down oblivious of the situation; that plaintiff was struck when he was in the traveled portion of the street and that there was ample time in which to have stopped the automobile.

Defendant contends the court erred in permitting, over defendant's objection, the introduction in evidence of the ordinance of the City of Marceline prohibiting the driving of motor vehicles upon its streets at a rate of speed in excess of fifteen miles per hour. This contention cannot be sustained. The record discloses that Marceline is a city of the third class. and being so classified. its rights and powers are defined by section 6806, Revised Statutes 1929 (8293, R. S. 1919). The pertinent language of this section is:

"The council may prevent and punish for all . . . fast driving

or training in the streets, highways, avenues, alleys, or over bridges or through tunnels in the city, . . . regulate, prevent and punish for the riding, driving, leading, standing, hitching, or passing of horses, mules, oxen or other teams or stock or animals or any vehicles over or upon or across or along any sidewalk, street, avenue or alley of the city.''

In construing a similar statute (Sec. 9422, R. S. 1909), as applied to cities of the fourth class, in City of Windsor v. Bast, 199 S. W. 722, 723, this court held:

''Such cities have control of their streets and public places, and can make all reasonable and needful regulations as to travel and traffic thereon which are not only necessary for the expedition of business, but also for the protection of the lives and the preservation of the safety of the people traveling thereon.'' [Citing Hannibal v. Telephone Co., 31 Mo. App. 23; City v. Green, 70 Mo. 562.]

However, it is true that courts can declare an ordinance unreasonable upon its face, by a mere inspection thereof, if perchance it is of that character. [City of St. Louis v. Theater Co., 202 Mo. 690, 100 S. W. 627.] The courts may also declare an ordinance unreasonable upon the showing of a state of facts that it is so. [State ex rel. v. Birch, 186 Mo. 205, 85 S. W. 361; Kelly v. Meeks, 87 Mo. 396, 401.] But, unless its unreasonableness is apparent upon the face of the ordinance, the burden is on the one asserting, to present facts so showing. [City of St. Louis v. Comm. Co., 226 Mo. 148, 156, 126 S. W. 166.] In the case at bar there was no proof that the ordinance was unreasonable; and neither was there any allegation in the answer that it was unreasonable. [See also Pabst Brewing Co. v. Laitner, 208 S. W. 487, in which this court made the same ruling as in the Windsor case, supra.]

These rulings we hold to be good law and not in conflict with the case of O'Donnell v. Wells, 323 Mo. 1170, 21 S. W. (2d) 762. In that case the Supreme Court held void an ordinance of the City of St. Louis, because the assembly of the city had attempted to adapt the theory of the statute (Sec. 19, Laws 1921, 1st Ex. Sess., p. 81) to city conditions. The court said:

''Comparison convinces us the assembly had before it the statute when the ordinance was enacted. Changes were made to adjust the regulations to conditions existing in the city. And the requirement of the highest degree of care was omitted from the ordinance. These changes and omissions indicate attention was given to the statute in preparing the ordinance. A vital change was the substitution of the word 'proof' for the words 'evidence, presumptive but not conclusive' in the first proviso of this section of the statute, and the omission from said proviso of the clause 'but the burden of proof shall continue to be on the prosecution to show by competent evidence that,

at the time and place charged, the operator was driving at a rate of speed which was not careful and prudent.'

" 'Proof' is defined as 'the conviction or persuasion of the mind of a judge or jury, by the exhibition of evidence, of the reality of a fact alleged. Thus, to prove is to determine or persuade that a thing does or does not exist . . . Proof is the perfection of evidence, for without evidence there is no proof, although there may be evidence which does not amount to proof . . .' [3 Bouvier's Law Dictionary, Third Revision, p. 2749.]

"Now this substitution and omission convince us the assembly did not approve of the provision of the statute making said speed for said distance only presumptive evidence. The city lawmakers intended said speed for said distance to be conclusive evidence of driving at a rate of speed which is not careful or prudent. Otherwise the substitution and omission would not have been made. The assembly is without power to prescribe what shall be proof of any fact."

For the reasons set forth, the court declared the ordinance unconstitutional and, of course, void. The O'Donnell case has no application here.

It is urged plaintiff's instruction No. 1, on the humanitarian theory is erroneous because, among other things, it submits that if the driver of the automobile could have swerved the car to the left and avoided striking plaintiff, he should have done so. The testimony in defendant's behalf on this point is conflicting. Lomar, defendant's witness, driving another car westward on the viaduct, testified (as pointed out in our statement of facts) that, had the driver of defendant's car swerved to the left, he would have collided with the Lomar car; while defendant's witness, Conrad, on cross-examination, stated there was nothing down the hill to obstruct the car on the incline, and that if the car had gone down the hill on the traveled portion, there was no obstruction. Thus, there is a conflict between the testimony of defendant's witnesses, Lomar and Conrad, as to whether the Lomar car would have been struck if the driver of defendant's car had swerved it to the left. In this state of the record, we must hold plaintiff's instruction No. 1 was not error in the respect charged, and we rule this point against defendant.

This carries with it, also, a ruling that plaintiff's instruction No. 2 was not error. Moreover, there were no objections to the giving of plaintiff's instructions, and therefore defendant is not entitled to complain at this time. [Sheets v. Insurance Co., 226 Mo. 613, 126 S. W. 413.]

Plaintiff urges defendant is in no position to complain of the admission in evidence of the ordinance in question, because, in the motion for a new trial reference is general and not specific as to the admission of evidence. This point must be ruled against plaintiff,

under the latest decisions of the Supreme Court which hold such reference sufficient to preserve the point. [Wampler v. Railroad, 269 Mo. 464, 190 S. W. 908; State ex rel. v. Reynolds, 278 Mo. 554, 213 S. W. 782.] The cases relied on by plaintiff on this point do not properly declare the law applicable here.

The statement of the driver of defendant's car to the effect that he "had a little accident" and "hit Mr. Ellis" was incompetent because not a part of the *res gestae*. However, it appears these facts were not disputed. The telephone conversation in response to which Crockett, the driver, came to the house of testifying witness to fix a car, was proper. [Meeker v. Union Electric Co., 279 Mo. 574, 605, 216 S. W. 923; Guthrie v. Holmes, 272 Mo. 215, 198 S. W. 854.]

For the reasons above stated, the judgment is reversed and the cause remanded. All concur.