Stella JAMES et al., Plaintiffs-Respondents,

v.

Rudy TURILLI, d/b/a Jesse James Museum,
Defendant-Appellant.

No. 33962.

St. Louis Court of Appeals,
Missouri.

Sept. 28, 1971.

Motion for Rehearing or for Transfer to Supreme Court Denied Nov. 29, 1971.

Application to Transfer Denied Jan. 10, 1972.

Robert A. Cedarburg, St. Louis, for plaintiffs-respondents.

G. C. Beckham, Steelville, Morton K. Lange, St. Louis, for defendant-appellant.

CLEMENS, Commissioner.

General background information about the parties' status will accentuate the issues here, which arise out of plaintiffs' claim to a $10,000 reward offered by the defendant.

Plaintiff Stella James is the widow of Jesse E. James, son of the notorious Missouri desperado, Jesse W. James; plaintiffs Ethel Rose Owens and Estelle Baumel are her daughters. They contend that on April 3, 1882, Jesse W. James was shot and killed by one Robert Ford who pled guilty to the murder.

Defendant Rudy Turilli operates the "Jesse James Museum" at Stanton, Missouri. He contends the man shot, killed and buried as Jesse James in 1882 was an imposter, that in fact Jesse James lived for many years thereafter under the alias J. Frank Dalton and last resided with defendant at his museum into the 1950's. Admittedly, defendant offered a $10,000 reward "to anyone who could prove me wrong."

By this action plaintiffs seek to recover the reward. They got a $10,000 verdict and judgment and defendant has appealed. He complains that plaintiffs' petition and evidence were both insufficient, that an affidavit was improperly received in evidence, that one paragraph of plaintiffs' verdict-directing instruction lacked evidentiary support and another paragraph was confusing. These in turn.

*Sufficiency of the Petition.* Plaintiffs pleaded an accepted unilateral contract. Paragraph 3 pleaded defendant's unilateral offer: "That on February 27, 1967, the Defendant before a nationwide television audience denied that Jesse Woodson James, Missouri's famous outlaw, was killed on April 3, 1882; but alleged that he lived as J. Frank Dalton until the aforesaid J. Frank Dalton died; Defendant then went on to state that he 'would pay Ten Thousand Dollars ($10,000.00) to anyone, yourself Mr. Pyne, Mr. Gruber, the audience and the network audience, to anyone who could prove me wrong.' "

By paragraph 4 plaintiffs pleaded their acceptance by performance: that after hearing defendant's offer they submitted to him affidavits of persons in and acquainted with the Jesse James family, each stating facts constituting evidence Jesse W. James "was in fact killed as alleged in song and legend on April 3, 1882, by Robert Ford."

By his answer defendant admitted his television appearances where he discussed the general subject of Jesse W. James but otherwise denied the offer alleged in paragraph 3 of the petition. Defendant also denied plaintiffs' performance as alleged in paragraph 4.

Defendant challenges the petition as declaring on an indefinite offer. He cites Bay v. Bedwell, Mo.App., 21 S.W.2d 203 [1, 2] where the court said: "It is fundamental that the essential terms of a contract must be certain or capable of being rendered certain through applying ordinary canons of construction to the contract or by reference to some other agreement or matter, in order to be enforceable." Plaintiffs respond with a quotation from Hoggard v. Dickerson, 180 Mo.App. 70, 165 S.W. 1135 [2, 3]: "An offer of reward is in the nature of a contract with any and every person undertaking to comply with its terms. (Citations). The construction of contracts of reward is governed by the same rules applicable to contracts in general * * * and it is a familiar rule of law that a contract should be given a reasonable construction and one that tends to make it valid rather than destroy it altogether. (Citations)."

The parties' dispute about the petition's sufficiency hinges on the word "prove," a word of ordinary meaning. For present purposes we accept defendant's own definition of the word: "Under ordinary rules of construction 'to prove' is to determine or persuade that a thing does or does not exist," citing Ellis v. Wolfe-Shoemaker Motor Co., 227 Mo.App. 508, 55 S.W.2d 309, l. c. 312. By his alleged offer defendant did not say, as he could have, to whose satisfaction he should be proven wrong. He now argues "[t]he words 'could prove me wrong' in and of themselves, we submit, imply the existence and action of somebody, or some Court, or some jury, or some board, commission, referee or tribunal capable of taking such action as might be necessary to fairly decide the issue one way or another." We decline to technically interpret the word "prove" as it would be used in referring to a court trial. It was an ordinary word spoken by one layman to others. Defendant concedes in his brief

that the words "prove me wrong" . . . "denote an intention to require at least sufficient evidence to persuade the mind of an ordinary man and evidence which according to ordinary standards would be competent for that purpose."

■ We hold the trial court properly denied defendant's motion to dismiss the petition. It pleaded an offer to pay a reward if the plaintiffs proved him wrong about Jesse W. James being alive after 1882. Whether the plaintiffs' affidavits were sufficient to persuade an ordinary man that Jesse W. James was killed in 1882 was an issue to be determined by the trier of fact.

*Admissibility of Plaintiffs' Affidavits.* As said, plaintiffs pleaded they accepted defendant's offer of a reward by tendering affidavits which "proved him wrong." Plaintiffs offered in evidence the six affidavits previously submitted to defendant in response to his offer; these by persons in or connected with the James family relating to facts about the death of Jesse W. James in 1882.

■ Except for plaintiffs' Exhibit C–3 the trial court sustained defendant's hearsay objections to the affidavits.[1] This ruling would have been proper if plaintiffs had the burden of convincing the jury that

Jesse W. James was, in fact, killed in 1882. That was not this case. Instead, the plaintiffs' burden was to show that these affidavits were sufficient to persuade the mind of an ordinary man that the defendant was wrong in contending Jesse W. James lived many years after 1882. That being the issue, each affidavit was in itself an independently relevant fact and was admissible as each affiant's declaration. As said in Miller v. Brunson Const. Co., Mo., 250 S.W.2d 958 [9, 10]: "Where, regardless of the truth or the falsity of a statement, the fact that it has been made is relevant, the hearsay rule does not apply, but the statement may be shown. Evidence as to the making of such statement is not secondary but primary, for the statement itself may constitute a fact in issue, or be circumstantially relevant as to the existence of such a fact."

■ Defendant claims error in the admission of plaintiffs' Exhibit C–3, the only one received in evidence. This was an affidavit made in 1938 by Thomas M. Mimms, then 90 years old. Therein he stated his sister Zerelda was the widow of Jesse W. James, whom he knew well; that on April 3, 1882, his sister sent him a telegram stating Jesse W. James had been killed; that he attended the funeral, viewed the body

---

1. The rejected affidavits:

Exhibit B: The 1968 affidavit of Stella James stated she is the widow of Jesse Edwards James, son of Jesse Woodward James; that the James family Bible recited his death at the hands of Robert Ford on April 3, 1882; that Zerelda James, Jesse W. James' mother, often stated that fact, as did Jesse James' brother Frank James and his widow Zerelda Mimms James, all having identified the dead body of Jesse W. James.

Exhibit A and C–1: The 1948 affidavit of James F. Howard stated he was a boyhood neighbor of Jesse James, then known as Tom Howard, and with his father went to the James' home right after the shooting, where the body was identified as Jesse James; that "J. Frank Dalton" does not look like Jesse James.

Exhibit C–2: The 1937 affidavit of William Lee Myers stated he was a friend of Jesse James after 1863 and was with

him many times; that on April 4, 1882, at the request of a Kansas City detective, he went to St. Joseph and positively identified the body of his friend Jesse James.

Exhibit C–4: The 1937 affidavit of Perry Samuels, stated he was the son of a former slave of Zerelda James (Samuels), Jesse James' mother; that he lived on the James-Samuels' farm near Kearny, Clay County, Missouri; that Jesse James often visited his mother there, last a few days before the shooting; that the body buried at the farm on April 6, 1882, was that of Jesse James.

Exhibit C–5 and 6: The 1936 affidavit of Jesse E. James declared he was the son of Jesse W. James; that when seven years old he was playing in an adjoining room of the St. Joseph home when he heard a shot; that he saw his father die in his mother's arms and later saw his father's body in a coffin.

and knew it was that of Jesse W. James. The trial court overruled defendant's hearsay objection; this on the ground the affidavit came within pedigree exception to the hearsay rule. Exhibit C–3 was admissible, not just because it was a pedigree exception to the hearsay rule, but because it like the other affidavits was admissible as an independently relevant declaration.

*Sufficiency of the Evidence.* Defendant challenges this on two levels: that plaintiffs failed to prove either an offer by him or performance by plaintiffs.

Defendant contends the offer attributed to him by plaintiffs was incomplete in that Mrs. James quoted him as saying he would pay the reward "to anyone who could prove me wrong" but "they neglected to establish what it was they were to prove [me] wrong about." In determining the sufficiency of plaintiffs' evidence we must give them "the benefit of every reasonable favorable inference which the evidence tends to support." Mathes v. Trump, Mo., 458 S.W.2d 297 [1]. Can it reasonably be inferred that when defendant offered the reward to anyone who could prove him wrong he was referring to Jesse W. James being alive after 1882?

Defendant admitted that on the television show the general subject of Jesse W. James was discussed. At trial he testified: "Q Now, on February 27th, 1967, did you appear on the Joe Pyne Show? A I did. Q And during the course of that show did you make the offer to anyone in the television audience, Mr. Pyne, Mr. Gruber or to anyone on the Network Television that you would pay them ten thousand dollars? A I did. Q And if they could prove you wrong? A Right. Q All right.

\* \* \* Q Mr. Turilli, was that offer made in good faith? A It sure was."

Plaintiff Stella James testified: "Q All right. Now, in this lawsuit that you and your two daughters have filed, your petition contains this statement, 'That on February 27th, 1967, the defendant, before a nationwide television audience, stated that he would pay $10,000 to anyone who could prove that Jesse James really was killed and didn't live to be some 100 years old.' Now, Mrs. James, I want to ask you if you are sure that these are the exact words that were used by Mr. Turilli on this television program. A No, no. I don't know the exact words."

We consider this testimony in the light of other evidence that defendant had virtually made a career out of his contention Jesse W. James was not killed in 1882 but lived many years thereafter as J. Frank Dalton. These items from the record: In 1948 defendant met J. Frank Dalton and began a long investigation of his claim to being Jesse W. James. Defendant then took J. Frank Dalton to live with him and since that time defendant has operated the "Jesse James Museum." Defendant published a book titled "The Truth About Jesse James." In 1949 defendant went to Excelsior Springs to see Robert James, a nephew of Jesse W. James; asked if he tried to get Robert James to come to his museum, defendant answered: "We had a certified check of ten thousand dollars if he would come down and prove that this man was not Jesse James." In 1950 the defendant sponsored and paid the expenses of an extended but unsuccessful suit by J. Frank Dalton to change his name to Jesse W. James. At that trial defendant Turilli produced five witnesses to prove that "J. Frank Dalton" was really Jesse James.[2]

2. In a decree that probably would have King Solomon's approval, Judge R. A. Breuer ruled from the bench: "This Court is called upon to change a man's name when there is nothing to change, because he has never changed it, and by law it has never been changed from Jesse James to anything else. If he isn't what he professes to be, then he is trying to perpetrate a fraud upon this Court. If he is Jesse James, what he claims to be, then my suggestion would be that he retreat to his rendevous and ask the good God above to forgive him so he may pass away in peace when his time comes to go."

Considering all this en masse it supported an inference that when defendant offered the reward to anyone who could prove him wrong he was referring to his contention that Jesse W. James was not killed in 1882 but lived for many years thereafter.

The other prong of defendant's attack on the sufficiency of plaintiffs' evidence concerns plaintiffs' performance. As pointed out earlier, the offer of a reward is a unilateral contract which becomes complete when accepted by performance of the act called for in the offer. A claimant to a reward needs only to show substantial performance. Smith v. Vernon County, 188 Mo. 501, 87 S.W. 949 [1]; Lovejoy v. Atchison, Topeka & Santa Fe Railroad Company, 53 Mo.App. 386. As with other contracts, literal performance is not required. McAlpine Company v. Graham, Mo.App., 320 S.W.2d 951 [4]; American Paper Products Co. v. Carroll, 290 Mo. 204, 234 S.W. 803 [5].

As mentioned above in ruling plaintiffs' petition, the plaintiffs were required to present defendant with information sufficient to persuade an ordinary man to believe Jesse W. James was killed in 1882. In testing the sufficiency of the evidence to meet that burden we must view it in a light most favorable to plaintiffs and indulge every inference which men of average intelligence and fairness might draw from the proven facts. Knight v. Wabash Ry. Co., Mo., 85 S.W.2d 392 [1]. And we may not upset the verdict unless it is so palpably unreasonable that reasonable minds can reach no other conclusion about it. Killoren v. Killoren, Mo.App., 370 S.W.2d 644 [4]. The jury had before it the 1938 affidavit of Thomas Mimms, Jesse W. James' brother-in-law, declaring under oath he had seen the telegraphic report of Jesse W. James' death and that he had identified his body at the funeral. In passing on the sufficiency of the evidence we consider that by its verdict the jury did accept this as proof the defendant was wrong about Jesse W. James living beyond 1882.

We cannot say as a matter of law that the plaintiffs failed to make a submissible case.

*Plaintiffs' Verdict-Directing Instruction.* This was a modified MAI 26.01, Unilateral Contract. Defendant contends paragraph First lacked evidentiary support. It hypothesized defendant's offer: "First: Defendant proposed that if anyone, yourself, Mr. Pyne, Mr. Gruber, the audience and the network audience, to anyone who could prove me wrong, that Jesse W. James was not killed on April 3, 1882, defendant would pay $10,000 and".

Defendant repeats his contention there was no evidence to show what it was he was wrong about as hypothesized in paragraph First. In passing on the submissibility of plaintiffs' evidence we ruled that it was reasonably inferable that when defendant offered a reward to anyone who could prove him wrong he was speaking about Jesse James living beyond April 3, 1882. Adhering to that conclusion we rule that paragraph First did have evidentiary support.

Paragraph Second of plaintiffs' verdict-directing instruction hypothesized plaintiffs' acceptance of defendant's offer. It read: "Second: Plaintiffs after learning of defendant's proposal, and within a reasonable time after the proposal was made, provided the defendant with the data and affidavit*s* of individuals who were acquainted with and knew Jesse James, and of his death on April 3, 1882, and that such data and affidavit*s* were proof of his death on April 3, 1882, and". (Our emphasis)

Defendant's only challenge to paragraph Second, both in his after-trial motion and in his brief here, is that it was confusing and misleading. This because it referred to affidavit*s* when only one affidavit was received in evidence. In passing on the effect this may have had on the jury the trial court could consider the

following factors. By MAI 2.01 the trial court had cautioned the jury to determine the facts from the evidence adduced and the exhibits received in evidence, without guesswork or speculation. While cross-examining the defendant as an adverse witness counsel for plaintiff had defendant identify six documents as affidavits by named persons; nothing was said about the substance of the affidavits or that they related to plaintiffs' claim to the reward. Later on, when plaintiffs offered the affidavits in evidence defendant's specific objections, counsels' arguments and the court's rulings were made outside the jury's presence. As said, the court excluded all the affidavits except that of Thomas Mimms which was read to the jury.

By upholding the giving of plaintiffs' verdict-directing instruction it is apparent the trial court believed a jury of reasonably intelligent men and women was not confused by the use of the two plural words in the instruction. That is a test for determining whether an instruction is confusing. Price v. Seidler, Mo., 408 S.W.2d 815 [18]; Stewart v. Sioux City & New Orleans Barge Lines, Inc., Mo., 431 S.W.2d 205 [10]; and Epperson v. Nolan, Mo.App., 452 S.W.2d 263 [13, 15].

A contention that an instruction is misleading and confusing is addressed initially to the trial court's discretion. Edie v. Carlin, Mo.App., 369 S.W.2d 610 [1–3]; Strother v. Sieben, 220 Mo.App. 1027, 282 S.W. 502 [4]; and Cooper v. 804 Grand Bldg. Corp., Mo., 257 S.W.2d 649 [3], where the court stated parenthetically: "(We think the author of the Winston opinion [Winston v. Kansas City Public Service Co., Mo.Sup., 249 S.W.2d 377] should have further said that the granting of a new trial on the ground that an instruction containing the criticized language was misleading is a discretionary matter subject to an appellate court's review as to abuse thereof.)"

Judicial discretion is abused when a trial court's ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration; if reasonable men can differ about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. Anderson v. Robertson, Mo.App., 402 S.W.2d 589 [3–4].

Certainly, reasonable men could differ as to the trial court's conclusion that the jury was not confused. It follows we cannot convict the trial court of an abuse of discretion. The point is denied.

Finding no reversible error, the judgment is affirmed.

PER CURIAM:

The foregoing opinion of CLEMENS, C., is adopted as the opinion of this court. Accordingly, the judgment is affirmed.

BRADY, P. J., and DOWD and WOLFE, JJ., concur.