JAMES B. MULCAHEY, RESPONDENT, v. BROTHERHOOD OF RAILWAY TRAINMEN, APPELLANT—79 S. W. (2d) 759.

Kansas City Court of Appeals. December 3, 1934.

*Harlan, Crawford & Harlan* for respondent.

*Tom J. McGrath* and *Montgomery, Martin & Montgomery* for appellant.

BLAND, J.—This is an action to recover the sum of $1875 alleged to be due the plaintiff under the terms of a beneficiary certificate issued to him by the defendant. There was a verdict and judgment in favor of plaintiff in the amount sued for and defendant has appealed.

The facts show that defendant is an unincorporated fraternal beneficiary association with its Grand Lodge at Cleveland, Ohio; that membership in the association is restricted to railway trainmen actually employed as such or in railroad yard service; that plaintiff was a member of the association and held the certificate therein which is sued upon. The certificate provides for the payment of the sum of $1875 to the plaintiff, if, while, in good standing, he should "suffer the complete and permanent loss of the sight of both eyes."

In June or July, 1932, and during the time that plaintiff's insurance was in good standing, he suffered a heat stroke while working as a switchman in the Missouri Pacific Railroad Company yards in Sedalia. He continued to work as a switchman for that company until September, 1932, at which time he was let out of service on account of the condition of his eyes. He claims that in the month of September, 1932, he suffered the complete and permanent loss of the sight of both of his eyes. The policy provided that insured should "pay all dues and assessments imposed upon him within the time specified by the constitution and general rules. Any failure to make such payment of either grand or subordinate lodge dues, or any general or special assessment levied, shall at once forfeit any and all rights hereunder, and this certificate shall become null and void without notice to the assured."

The evidence further shows that plaintiff paid his assessments until the first of July, 1933, but has paid no assessment since that time. Under the terms of the contract the policy terminated, in so far as future coverage is concerned, as of that date. [Springfield Steam Laundry Co. v. Ins. Co., 151 Mo. 90; Ashbrook v. The Phoenix Mut. Life Ins. Co., 94 Mo. 72; Darby v. Northwestern Mut. Life Ins. Co., 293 Mo. 1; Elms v. Life Ins. Co., 211 Mo. App. 514.] However, plaintiff claims a waiver of the termination or forfeiture.

The case was tried on the 7th day of March, 1934. Plaintiff testified that from the date of his becoming overheated his eyes began to fail; that he obtained glasses and went back to work and remained thereat until he was discharged on the 27th or the 28th day of September, 1932; that he had done nothing since; that he lives on a small farm near Sedalia. Plaintiff further testified that

after he ceased working for the railroad company his "eyes were pretty bad, but worse now;" that he could not see to do the work of a switchman; that "I can't see hardly anything and my eyesight is getting worse every day; I can tell that much, it's a good deal worse now than it was a year ago or six months ago or three months ago." . . . "No sir, if I got out to try to do any little thing my eyes just jumps and I have to close them, everything goes dark. I have to get in the house and lay down;" that he could not see to do any work and could not read; that if he tried to do any lifting his eyes would jerk; that he could not use them and any strain upon them made them worse; that he was wearing glasses; that without glasses he could not "see' at all;" that he could not "see to get around."

On cross-examination he testified that "I carry in a little wood and look around after my cows; that is about all I do. I don't milk her;" that he was unable to cut wood; that the condition of his eyes had "been getting worse as time goes on;" that there was some change in the past three months; that he thought there had been a great deal of change; that his eyes were "getting worse all the time."

His deposition was taken on February 12, 1934, which was about a month prior to the time the case was tried. He was asked concerning certain testimony that he gave in his deposition. He testified that when his deposition was taken he could see people "sitting across the table;" that he was then and is now able to read big print. At the trial, upon being handed the beneficiary certificate sued upon he was able to read the heading thereon, "Brotherhood of Railroad Trainmen" in big print but was unable to read any other part except the words "issued to." "Q. Don't you recall reading from the face of this beneficiary certificate? A. I can't read it now. My eyes go and come. Q. But you recall reading the form? A. I just read a few lines." He testified at the trial that he was not able to "get around the streets;" that he does not walk on the streets by himself; that "I can get around on the sidewalk, but I am afraid to cross the street; I can't look sideways and if I go to cross I turn this way or this way and look plumb around;" that he is afraid of automobile traffic at the intersections; that he could tell where the intersections were when he reached them; that "I can manage to get down on the sidewalks. . . . I guess at . . . the sidewalks, curbings and buildings . . . a great deal;" that he always looked straight ahead and did not look to the right or the left; that he could step from the sidewalk "if I look straight ahead and see the sidewalk." Asked if his eyes had gotten materially worse since February 12, he replied that he thought they were getting worse every day. "Q. On the 12th day of February you were able to see to get around on the sidewalk? A. I

got around on the sidewalks; I can get around now. Q. And you can see people you meet in the street? A. Why, I can see people, yes. Q. And you can see the cars parked along the curbing? A. I can tell there are cars there. Q. There isn't any danger of you running into anybody or into anything while walking out on the sidewalk? A. I have run into people on the sidewalks;" that he could see people when passing on the sidewalk, "but I can't recognize them, . . . I can't see when I get to the intersection;" that, "I can see objects moving as far as a block," but he cannot distinguish what they are; that his house was half a block, or less, from his barn and that he could see his cows in the barn lot, but he could not "recognize them as cows;" that he could not tell a black cow from a red cow; that he could recognize objects moving along the sidewalk across the street as persons but he could not tell whether such persons were men or women. He supposed they were men or women because he did not expect any other creatures on the sidewalk; that he could not recognize a person across the street; that his trouble was not only with close vision but with distant vision; that he tries to read the headlines in the newspapers and sometimes he can and sometimes he cannot; that at times "I can read a little bit, other times I can't read a thing;" that he saw the papers "maybe once a week or once a month, sometimes my vision is all right, but other times I am plumb blind." Later he testified that he did not mean that his vision was all right but that at times he could "read a little bit (of the headlines), other times I can't read a thing." When certain of his deposition was read to him wherein he testified that he could see and recognize a cow in his lot while he was at the house, he testified (at the trial), "Yes, I knowed them cows were over there and see a object;" that he could see the cow but he could not tell "which one was which."

He was unable to recognize or identify the proofs of loss that he had submitted to the defendant, because his daughter-in-law had made them out he could not recognize his signature. He testified that he remembered signing the proofs. On re-direct examination he testified that all he did around the house was "just carry in a little wood;" that he was required to hire a man to look after the farm because the witness could not "see to take care of my strawberries and stuff;" that he could not take care of these things "because if I do anything like that, leaning over or working, my eyes practically go to the bad altogether and I can't see nothing, I have to go—tried it, but I couldn't see only about five minutes or so. I would just go plumb blind and have to go sit down some place and cover my eyes up." He also testified that he could not identify one of the papers contained in the proofs of loss "because now when I have been sitting here so long and under the strain, my eyes are just practically gone;" that he could only read the headlines in the

newspapers for about five or six minutes, and then "It all blurs and I have to put it down and rest my eyes awhile, then pick it up and look at it again in a minute or two, then have to lay it down. I can't continue at all."

His attorney held some object twenty feet away from the witness. The witness testified that he could see the hand of the attorney and could see something black in his hand. When two persons were seated in the other room twenty-five feet away from the witness he testified that he could see two men sitting there; that he could see that one of them was black-headed and the other was bald-headed or had a shiny head, and that was all that he could see; that while he was at his house he could see an animal in his barn yard but he could not tell whether it was a cow or a horse. Counsel for plaintiff stood thirty feet from the witness and held his hand up with some object in it. The witness could see his hand being held up but could not see anything in his hand but saw that the attorney held "something kinda dark up there between the light." The witness could not tell what it was. The attorney stood about thirty feet from the witness and the witness saw something standing to the left side of counsel but he could not tell whether it was a man, woman or child. He testified that he tried to plow his strawberries but was unable to do so because he "plowed the rows zigzag;" that a neighbor seeing that he was plowing up his strawberries did the plowing for him; that he could see the strawberries for awhile, "just a little bit;" that he could not work in the strawberry patch more than five or ten minutes; that he could not work any longer "because my eyes get to jumping, everything goes to moving. I would then have to sit down awhile and rest them, have to go in the house and rest awhile;" that "I get kind of blind and go sit down and rest until my eyes get quieted down, then I go to the house and have to lay down so they will quit hurting—they hurt awful in through here (indicating). Q. After you have worked five or ten minutes, why don't you go up to the house then, why do you lay down? A. I can't see to go to the house; I have to rest awhile before I go. Q. How long do those spells last? A. Oh, well, some will last a couple of hours, maybe; sometimes I lay down thirty minutes and feel pretty good."

Counsel for plaintiff held a dollar bill in his hand several feet away from the witness. The witness testified that he could see counsel's hand, "there is something on the outside of your hand," but he could not tell what it was. Counsel then stood fifteen away from the witness and the witness testified that the object in counsel's hand was getting a "little whiter," but he could not tell what it was. When counsel stood four feet from the witness, he testified that it "looked like it might be money, . . . or something, I can't tell." When counsel got twenty-four inches from the wit-

ness, he could not tell exactly what it was, but when counsel got nearer than a foot the witness identified it as money, but he could not identify it when it was further away. The bill was handed to the witness and he identified it as money but could not tell whether it was a one or a ten dollar bill. He then testified that he did not handle money, "because I can't tell one from another." Counsel then conducted some experiments by holding a pencil in his hand while the witness had his glasses off. The witness could not identify the pencil when it was six or seven inches away. He further testified that he did not drive an automobile and did not come to town by himself; that he lived four miles from the court house; that he would not drive a horse and buggy because he would be afraid of running into somebody; that he could not recognize an automobile or a wagon until it reached a point 150 feet from him; that then he could not recognize it as an automobile, but merely that something was coming; that he could not use his eyes, when he was performing labor, for over ten minutes at a time. "I just go blind and everything goes—I can't see and I have to go and sit down and rest my eyes."

Plaintiff's son testified that in December, 1932, his father did nothing around home except "walk around, he had a cow next door, he would go up and take care of it;" that he was not able to read the papers, whereas, previous to his getting overheated he read a good deal; that in the summer of 1933 his father would work awhile in the strawberry patch but left crab grass growing among the plants; that plaintiff would work ten, fifteen or twenty minutes in the strawberry patch, then sit down awhile, then go to the house; that his father tried to plow the strawberry patch and had "an old gray horse; would hook the horse up to one of those five shovel plows that you use for berry plowing, you know and he would try to plow that; he couldn't make it. He would have to stop. Q. Why couldn't he make it? A. He said—he would go plow up the berries;" that his father tried to play cards, but was unable to tell a spade from a club; that on one occasion he was unable to see a mare in the field which was standing in plain view of the house although plaintiff passed within fifty feet of the mare in looking for it.

Plaintiff's witness Bohon testified that he plowed plaintiff's strawberries for him because "he was plowing them up pretty bad;" that he had not seen plaintiff work on his place very much; that "I have seen him sawing a little wood, that's about all;" that plaintiff would not recognize him "until I get right up to him . . . five or six feet;" that on one occasion plaintiff did not recognize him when he was walking along the road and plaintiff was passing in an automobile.

While plaintiff was attempting to adjust his claim with the defendant, the latter asked that Dr. J. G. Love examine plaintiff, which the doctor did. The doctor was called as a witness by plaintiff. He testified that he examined plaintiff on August 29, 1933; that the examination consisted of having plaintiff read letters in a glass with a light in the back; that he found that plaintiff was suffering from an atrophy of the optic nerve of the right eye and in the left eye a neurol retinitis; that this would give plaintiff defective vision; that he did not think that it would become worse with temporary exertion or exercise; that the condition was permanent and would grow progressively worse; that plaintiff with his left eye was able to read letters an inch square at a maximum distance of twenty feet which, with normal vision, he would have been able to read at a distance of fifty feet; that with his right eye, plaintiff from a distance of fifteen feet was able to read letters one and one-half inches square, which with normal vision he could have read from a distance of 100 feet; that these readings were without glasses; that with glasses plaintiff saw with his right eye a letter two inches square at a distance of ten feet which, with normal vision, he could have seen at 200 feet; that with his left eye he saw the same letter at fifteen feet; that with the left eye he was able to read letters one inch square at a distance of twenty feet, which he could have seen with normal vision at fifty feet; that plaintiff had 68.1 per cent vision in the left eye and 21.5 per cent vision in the right eye, when corrected by glasses; that he would not say that plaintiff retained a substantial part of his vision but that he had sufficient vision to enable him to ''see to get around . . . and serve many useful purposes;'' that he would not say that plaintiff had completely lost the use of the sight of his eyes; that he did not think that plaintiff had enough sight left to engage in any gainful occupation.

Upon being recalled for further cross-examination the witness testified, upon being asked what plaintiff could see to do: ''Well, I think he can get out probably and walk around, might do a little work around home, probably in the garden;'' that he believed plaintiff could see well enough to get about the streets without any difficulty and that he was able to recognize people and other objects that he would meet up with in every day life; that he could read the large headlines in the newspapers; that he had a substantial part of his vision left, and by substantial part he meant ''to get around and do a little work around the home and such as that, of course, he hasn't vision enough to qualify in his occupation. . . . He might bring in a little coal or help around there. Just odd jobs, not be able to engage in any ordinary occupation. Just odd jobs,'' and in addition to this he could see well enough ''to get around the streets and to get around the house and dress himself and take care of himself.''

Defendant insists that its instruction in the nature of a demurrer to the evidence should have been given for the reason that the evidence does not show that plaintiff, up to the time his policy was forfeited for nonpayment of dues, which occurred on July 1, 1933, or, in fact, even at the time of the trial, had suffered the complete and permanent loss of the sight of both eyes, within the meaning of the contract.

We are now met with a serious difficulty in the case, that is to say, whether the condition of plaintiff's vision at the date of the trial or at the expiration of the policy (July 1, 1933) is to govern. In this connection defendant admits that if plaintiff had suffered the complete and permanent loss of the sight of both eyes on July 1, 1933, he is entitled to recover. As before stated, in so far as the coverage after July 1, 1933, is concerned, there was a termination of the policy on that date but plaintiff contends that defendant waived the termination or forfeiture after the loss was sustained and during the time that plaintiff was attempting to affect a settlement. It is claimed that it was waived by defendant accepting additional proofs of loss, by attempting to effect a compromise, by calling for a medical examination in an effort to discover the extent of plaintiff's disability and by finally denying liability on the sole ground that plaintiff's loss was not covered by the terms of the insurance contract.

The facts in reference to the point of waiver of the termination or forfeiture of the policy are as follows:

On December 1, 1932, plaintiff filed with the defendant a claim under section 70 of defendant's constitution. The claim merely appealed to the benevolence of the defendant. This claim was disallowed apparently on the ground that plaintiff had not suffered loss of eyesight in a degree necessary to permit a recovery under the terms of the policy. On June 14, 1933, plaintiff's attorneys wrote the defendant at Cleveland, its home office, saying that plaintiff desired to present a claim under section 68 of the constitution. This section gave plaintiff the absolute right to receive the amount of his insurance in case he suffered the complete and permanent loss of sight of both eyes. On June 24, 1933, defendant's general counsel wrote plaintiff's attorneys, in part as follows:

"I note you state that Mr. Mulcahey desires to present claim under Section 68. The proofs in his claim do not indicate that he has lost the complete and permanent sight of both eyes and unless such is the case he would not properly qualify under section 68. He should forward statements from medical authorities for the attention of our Beneficiary Board, or Individual Reserve Board in case he should transfer his insurance into our Individual Reserve Department. The Board will consider these statements and advise whether he can file a claim under section 68."

On July 1, 1933, plaintiff's attorneys wrote the defendant that they were enclosing a statement of Dr. Titsworth in support of plaintiff's claim under section 68. The statement of this doctor was dated June 27, 1933, and it apparently showed that plaintiff had "vision in one or both eyes—corrected with glasses in right eye 20-80, equivalent to seventy per cent visual acuity." On July 11, 1933, defendant's counsel wrote plaintiff's attorneys as follows:

"Since Mr. Mulcahey has useful vision in one or both eyes his claim cannot properly be classified as coming under section 68 of our Constitution and General Rules."

Thereafter several letters passed between the attorneys of the parties in which plaintiff was contending that there was liability on the part of defendant and the latter denying liability. On August 14, 1933, defendant wrote plaintiff:

"If Mr. Mulcahey's vision has become appreciably worse since June and he desires to submit to an examination by some eye specialist of our selection who has not already seen him, I will be glad to have this done. After such examination I will be in a position to state more clearly just what, if anything, I would be willing to recommend in the way of a compromise."

Thereafter plaintiff was examined by Dr. Love who reported that plaintiff has 20/140 vision with glasses in right eye and 29/50 in the left eye, and on September 25, 1933, defendant's counsel wrote plaintiff as follows:

"According to Dr. Love's findings Mr. Mulcahey still retains a combined average of visual capacity of fifty per cent or normal with glasses. This is far from being totally blind and for that reason I am authorized by our Beneficiency Board to advise you that his claim for insurance at this time cannot be recognized."

The petition alleges that "on or about the —— day of ————, 1931, in the State of Missouri, while the insurance aforesaid was in full force and effect, and while he was a beneficiary member in good standing, he suffered the complete and permanent loss of sight of both eyes, under the terms of Section 68 of the Constitution." The answer contains a general denial and pleads that the certificate of insurance lapsed and became forfeited upon plaintiff's failure to pay the dues and assessments levied for the month of July, 1933; that no proofs of disability were submitted, within the time required by the constitution and consequently, the insurance became forfeited and that plaintiff had not suffered the complete and permanent loss of the sight of both eyes within the meaning of section 68 of the defendant's constitution.

The reply was a general denial.

It will thus be seen that the case was pleaded on the theory that recovery was sought on the condition of plaintiff's eyes in 1931, long before the time that the policy was forfeited for nonpayment of

premium due on July 1, 1933. The petition makes no claim for any loss of sight occurring after 1931, nor does it allege that the policy was in force after that time. Plaintiff's instructions do not submit any issue of waiver or estoppel. The evidence we have detailed in connection with the question of waiver was introduced by the plaintiff in support of his contentions, made during the trial, that defendant had waived the claimed forfeiture based on the ground "of failure to submit proofs within the proper time and in the manner set forth in the constitution." Therefore it can be said that the point that the forfeiture or termination of the contract on July 1, 1933, was waived by defendant was not raised in the trial court but is presented for the first time in this court and, therefore, comes too late.

Even had plaintiff raised the matter in the trial court it would have been without merit. The accepting of additional proofs of loss, when plaintiff submitted his claim to the defendant under section 68, was done prior to July 1, 1933, or before the forfeiture for nonpayments of dues and assessments occurred. The offer of the defendant to consider an additional medical examination, which resulted in Dr. Love examining plaintiff, and everything done thereafter was in view of a possible compromise of the claim of which denial of liability repeatedly had been made before by the defendant. Compromises are favored by the law and an insurance company is not to be held to have waived any of its rights by offering to go into the matter of compromise after it has denied liability. Clearly there is no evidence tending to show an intentional relinquishment of a known right of the defendant, as waiver is defined to be in the case of State ex rel. v. Shain, 66 S. W. (2d) 871.

The testimony as to the condition of plaintiff's eyes up to July 1, 1933, does not show that he had suffered at that time a complete and permanent loss of the sight of both of his eyes. Reasonable minds could hardly differ about this. There is not a great deal of testimony that can definitely be said to go to his ability to see up to that time, but it appears that he was able to carry in wood, to take care of his cow, which he could see for approximately one-half block, although he could not tell the two cows apart at that distance; that he could work in his garden for ten to twenty minutes, hitch a horse to a plow, drive into his strawberry patch and plow his strawberries. A man who can do this is not blind although he plows up some of the plants. That was evidence of defective eyesight but not blindness. It will be noted that in working in the strawberry patch he would leave some of the grass but there was no testimony that he pulled up the plants, themselves.

The only definite testimony as to plaintiff's condition about that time was that of Dr. Love, who examined him on August 29, 1933. He found that plaintiff had at that time 68.1 per cent vision left in

the left eye and 21.5 per cent vision in the right, corrected by the use of glasses. From all of plaintiff's evidence it is apparent that he was not blind in July or August, 1933, although, at that time, he had difficulty in reading. The evidence all goes to show that plaintiff's condition is growing worse with time and that his condition was worse at the time of the trial than it was on July 1, 1933, and even worse when Dr. Love examined him. Therefore, the evidence of his condition at the time of the trial does not throw a great deal of light on the subject. However, it is doubtful whether plaintiff's evidence was sufficient to show that he had sustained, even at the time of the trial, a complete and permanent loss of the sight of both of his eyes.

There are not a great many cases in the country defining what constitutes complete loss of sight, but the law upon the subject, as reflected in those cases, is well expressed in that of Murray v. Aetna Life Ins. Co., 243 Fed. 285. In that case the policy provided for payment ''for the entire loss of the sight of one eye, if irrecoverably lost.'' An instruction had been given telling the jury that, if the injured eye could ''distinguish light from darkness, or perceive objects temporarily, for brief intervals,'' yet, if ''all useful and practical sight was irrecoverably lost'' plaintiff was entitled to recover. The court, in approving the instruction, said, l. c. 285, 286:

''The indemnity is virtually for the loss of the benefit of sight or vision. The latter may be defined as the ability to perceive, distinguish, and recognize objects, and the former as satisfaction of will, need or pleasure. If this ability is so far destroyed that what remains will not to practical and useful extent confer any of this benefit, entire sight, within the construction of analogous terms in insurance law, is lost. So would it be in popular phrase or sense. The interpretation must be reasonable and relative, not literal. The ability to perceive light and objects, but no ability to distinguish and recognize objects, is not sight, but blindness. So would it be though there were intermittent flashes of the latter ability. To no practical or useful extent would it serve the will, need or pleasure.''

In that case plaintiff was a physician and the court went on to say:

''It is not enough that sight may be so far lost and the eye so impaired that he is disabled to perform major operations, or to read continuously, or that, when he closes the uninjured eye, the injured one loses vision, or that natural coordination and accommodation are lacking; for defendant did not contract to pay upon the happening of any or all these contingencies, but only when entire sight was lost—when all practical and useful sight for any purpose of will, need or pleasure was lost. . . . If, after plaintiff has become very tired from the use of both eyes, he still has power in the left eye to such extent that he can close the right and still see with

the left eye thus abnormally burdened, for three to five minutes before its vision fails; if with lenses he can enjoy normal distant vision for several minutes at a time; if he can read the test chart; distant, for such as five minutes, and then, after resting ten or fifteen minutes, can again read it; if with the left eye alone, abnormally used, he could walk safely an indefinite distance on main street, fair to infer a fourth mile, or as far as easily walked in five minutes (and all this is the testimony of himself and physician)—it cannot be said that plaintiff has lost entire sight of the left eye. On the contrary, the proof is he has not.'' [See, also, Pan Am. Life Ins. Co. v. Terrell, 29 Fed. (2d) 460; Brotherhood of R. R. T. v. Britton (Tex.), 292 S. W. 286; International Trav. Assn. v. Rogers (Tex.), 163 S. W. 421; Continental Cas. Co. v. Linn (Ky.), 10 S. W. (2d) 1079; Sisson v. Sup. Court, 104 Mo. App. 54.]

Plaintiff was not insured against the mere impairment of his vision or the inability to engage in any gainful occupation. He must have suffered a complete and permanent loss of the sight of *both* eyes. This does not mean that plaintiff cannot recover by the mere showing of retention of light perception, that is, the ability to distinguish daylight from dark, but there is no liability under the policy so long as plaintiff has the ability to see and recognize objects, and the retention of enough sight to be of some practical and usual benefit to him in connection with his needs and pleasures in every day life.

Plaintiff's own testimony is conflicting as to his ability to see. Under such circumstances, his admissions against interest will be taken as true, rather than his statements taken in their most favorable light to him. [Pentecost v. St. L. Merchants' B. T. R. R. Co., 66 S. W. (2d) 533; Long v. Binnicker, 63 S. W. (2d) 831; Murray v. S. L. Transit Co., 176 Mo. 183; 189, 190; Behen v. St. L. Transit Co., 186 Mo. 430, 440, 441; Graefe v. St. L. Transit Co., 224 Mo. 233, 264, 265; Feary v. Met. St. Ry. Co., 162 Mo. 75, 105, 106; Shirts v. Overjohn, 60 Mo. 305, 308; Steele v. Railroad Co., 265 Mo. 97; Holmes v. Leadbetter, 95 Mo. App. 419; Cogan v. Cass Ave. Ry. Co., 101 Mo. App. 179, 188, 189.]

It will serve no useful purpose to prolong this opinion by a detailed analysis of plaintiff's testimony. It is sufficient to say that it shows that he still has sufficient sight to get around; that when his deposition was taken shortly before the trial he could see people across the table and could see to read some of the beneficiary certificate, aside from the heading in large print; that while he collides (how often is not shown) with persons on the sidewalk he is able to get around thereon; that he has the ability to get around his home, also to do some chores; that he is able to read the large print in the newspapers; that he was able to recognize his attorney in a series of experiments carried on during the trial, that he could

see the position of the attorney's hand; that he could distinguish a bald head twenty-five feet distant; that while he is unable to recognize people at a distance he can recognize an object as a person. He says, himself, that he is not wholly blind for he testified that *after using his eyes awhile when working* he "gets kind of blind," "goes blind." His testimony concerning the condition of his eyes after he had used them for awhile when working or under a nervous strain might indicate that, *for the purpose of working or under a nervous strain,* he had no beneficial use of them after that time and until they were rested, but defendant did not insure against this condition, but a complete and permanent loss of sight.

We have examined the cases cited by plaintiff and find that in no case was there as great an extent of the sight left as in the case at bar. Perhaps the most favorable case to plaintiff on the facts is that of International T. A. v. Rogers, supra. The court in summing up the evidence said, l. c. 424:

"The evidence, as we have seen, shows he cannot read with the injured eye, and cannot use it for getting about; that he tried to do so, and ran against a post; that he cannot tell distances with his eyes, and cannot tell how near vehicles or objects approaching him, such as a buggy, are to him until they get right at him. He was district commercial manager of the telephone company at Sherman, and while the evidence does not disclose to what extent he had to use his eyes in the performance of his duties or work in which he was engaged, yet it is manifest that, if his uninjured eye was in the condition his injured one is in, he would not be able to hold his position, and that for all practical purposes an eye in which there remains only one-tenth vision is of no service so far as performing the duties of a man's business is concerned. That, in effect, and results, and to all intents and purposes, appellee has lost the entire sight of his eye cannot be gainsaid, and such is the meaning of the word 'practical,' as used in the court's charge."

As before stated, unlike the evidence in the case last cited, the plaintiff, in the case at bar, is able to get about and there is no evidence that he has suffered the loss of sight to such an extent that he has left only one-tenth of vision.

The judgment is reversed. All concur.